William C. BOSTWICK,
Appellant,

v.

UNITED STATES of America,
Appellee.

No. 14934.

United States Court of Appeals.
Fifth Circuit.

Jan. 20, 1955.

Aubrey M. Cates, Jr., Montgomery, Ala., John Huddleston of Cates & Huddleston, Montgomery, Ala., of counsel, for appellant.

Fred S. Weaver, Asst. U. S. Atty., Double Spring, M. L. Gwathmey, Asst. U. S. Atty., Frank M. Johnson, Jr., U. S. Atty., Birmingham, Ala., for appellee.

Before BORAH, RIVES and TUTTLE, Circuit Judges.

RIVES, Circuit Judge.

This is an income tax prosecution, in which the Government computed the defendant's net income on the basis of bank deposits and currency used in each taxable year, and attempted to corroborate that proof by the increase in net worth method. We have delayed decision of the appeal until we could have the benefit of the opinions of the Supreme Court in the four cases decided December 6, 1954. Holland v. United States, 75 S.Ct. 127; Friedberg v. United States, 75 S.Ct. 138; Smith v. United States, 75 S.Ct. 194; United States v. Calderon, 75 S.Ct. 186.

The appellant was convicted of having violated Section 145(b) Internal Revenue Code, 26 U.S.C.A. § 145(b), by willfully and knowingly attempting to defeat and evade income tax. The tax years involved were 1946, 1947 and 1948. The jury found the defendant guilty for the latter two years and the court sentenced him to 18 months imprisonment and $1,000.00 fine.

The first specification of error is that the court erred in failing to provide the defendant an opportunity to object to the charge of the court out of the hearing of the jury as required by Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C.A. See also Rule 51, Federal Rules of Civil Procedure, 28 U.S.C.A. What occurred is set out in the footnote.[1] Whether that

1. "The Court: Now, Mr. Cates has called my attention to the fact that the testimony which he expects to offer with reference to the silence of the record as to any objection to the Court's oral instructions, and to the fact that no opportunity was given to the Defendant to make objection to the Court's charge or omission to charge out of the presence of the jury.

"Now, with respect to that, insofar as my own recollection is concerned, I will state for the record that there was no request made of me at the conclusion of my charge to register an objection to the charge, or the failure to charge; nor was there any request made that an opportunity be afforded the Defendant to make such an objection out of the presence of the jury.

"My further recollection is that I paused for some thirty seconds or more after I concluded my charge before I told the jury to retire and consider their verdict, since no objection was then made, nor was there any evidence that an objection would be made. Certainly no request for objection was made at that point.

"My further recollection is that I concluded by charge to the jury and directed them to retire and consider their verdict at 10 minutes before 10:00 in the morning. That time of course is approximate; that at about 11:30 or 25 minutes until 12, Mr. John Huddleston, Mr. George Huddleston and Mr. Cates came into my chambers, after the jury had been deliberating since about 10 minutes to 10:00 o'clock, and asked if then they might register an objection to the charge which I had given the jury.

"I told them that they certainly might do it, but that I would let the record speak the truth with respect to that, which would have shown that the jury had been then deliberating approximately an hour and a half. Then somewhat facetiously it was remarked that if the record showed that there would be no use to make an objection. And I agreed that that was probably true.

"That is my entire recollection of the whole point.

"Mr. Fulford: The Government is willing to stand on that recollection. Your Honor.

"The Court: I would not deprive the attorney for the Defendant the right of disagreeing with that recollection, or putting forward anything else that they might have. I think they should make the record complete.

"Mr. Cates: Can we pause just a minute and be off the record?

"The Court: Oh, yes.

"(Discussion was had off the record.)

"Mr. Cates: I will ask Your Honor one further question.

"The Court: You may make any statement, I don't want you cut off. You make any statement for the record you want to.

"Mr. Cates: I will just make this statement. And correct me if I'm wrong—

"The Court: Sure.

"Mr. Cates: My recollection—and I would so testify—is that the Court did not by any words ask if the defense was satisfied with the charge, or the omissions therefrom.

"The Court: That is correct.

"Mr. Cates: That's for that part.

"The Court: That's correct.

"Mr. Cates: As to whether or not the Court made any signs such as nodding and glancing, I wouldn't make any positive statement. The only thing I could say was that the Court was facing the jury throughout the whole procedure, or virtually all of it.

"The Court: That's true. When I delivered my instructions I did face the jury. And, my recollection may be imperfect, but I will say this for the record, that it is my practice not to call the jury's attention to any exceptions or objections that the attorneys either in civil or criminal cases want to take to my charge; but rather to put the onus on the attorneys to approach the bench; and I feel sure that I looked to determine, and paused to determine whether the counsel

amounted to a compliance with Rule 30 or not is probably immaterial because there seem to be no errors in the charge. The only errors suggested relate to two passages quoted in another footnote [2], both of which are so obviously sound as not to merit discussion.

■ Specification 2 is that: "The District Court erred in requiring the sequestration of a certified public accountant proposed to be used by the defendant as an expert witness." "Where 'the rule' is invoked as to witnesses, the mode and manner of its enforcement is confided largely to the discretion of the court, and the exercise of that discretion will not be disturbed except in clearest cases of abuse." 53 Am.Jur., Trial, Sec. 31, p. 47; cf. Jennings v. United States, 5 Cir., 73 F.2d 470, 471.

■ Specification 3 is that: "The Court was in plain error in refusing to permit the witness Griffin to testify as to his opinion of the adequacy of the records of the Turf Exchange." This specification is bottomed upon 26 U.S.C.A. § 41 [3] which the Supreme Court in Holland v. United States, 75 S.Ct. 127, held not to be applicable to the net worth method. For the reasons stated in Dupree v. United States of America, 5 Cir., 218 F.2d 781, also decided today, we hold that that section does not apply to the bank deposits and current expenditures method of proof primarily employed in this case though supported by the increase in net worth method. If by any chance that holding should be mistaken, and if that section should apply to a case like the one before us, we, nevertheless, find that the record does not support appellant's contention that the court erred in rejecting the testimony.

■ The revenue agent had testified for the Government that the records of the Turf Exchange did not adequately reflect the income of the defendant and his partners. The accountant testifying for the defendant was asked the following question, to which the Government's objection was sustained: "I will ask you if in your opinion the win and lost sheets that you have just shown constitute an adequate set of records?" The defendant's counsel did not pursue the subject, re-phrase the question, nor make it any more definite that the inquiry was directed to whether the records clearly and truly reflected the defendant's income from the Turf Exchange. The form of the question was certainly objectionable.

for the Defendant had any objections or exceptions.

"Mr. Cates: I think that's enough of a showing for the record. With that in view we feel that the Court as the governor of the trial is the one who should create the opportunity called for under the rule."

2. "You have a right to consider the evidence in the case, if you find it to be a fact, that this Defendant was a gambler, that he had no other business except that of gambling. You have a right to consider that in determining whether you will believe the testimony of witnesses that the Defendant had a good character during the years concerned."

"The presumption of innocence attends him at every stage of the proceedings against him. It is a palpable, tangible element of the case and continues to protect him until such a time as that the jurors in their deliberations are convinced of guilt beyond a reasonable doubt. If that time does come in your deliberations, when your minds are convinced of guilt beyond a reasonable doubt, the presumption of innocence has served its purpose. It disappears from the case and is no longer a part of the case for consideration by the jury."

3. "§ 41. General rule

"The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year."

Moreover, it was self-evident that unless gains and losses from gambling were truthfully and accurately entered in the "Win" and "Lost" columns of the accounting sheets, they did not truly reflect the income of the defendant and his partners in that enterprise. The most adequate method of accounting will not clearly or truly reflect income unless the items of receipt and expenditure are truthfully entered. The adequacy of a set of records, the backbone of which consists of entries in the columns "Win", "Lost" is within the comprehension of the ordinary juror and hardly requires the opinion of an expert witness. The jury were really concerned not with a set of bookkeeping entries, but with the facts concerning the defendant's income. This specification of error is without merit.

The remaining specifications of error relate to the sufficiency of the evidence to sustain the conviction, as presented by the motion for judgment of acquittal at the close of the Government's case and at the close of all of the evidence and renewed after verdict and judgment along with an alternative motion for new trial. We review the case "bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation." Holland v. United States, supra, 75 S.Ct. at page 132.

The taxpayer defendant had given to the special agent of the Internal Revenue Department a sworn statement dated March 8, 1951, which was introduced in evidence without objection and in which, among other things, the defendant said:

"No, I haven't filed any income tax except the first one when they checked Conners and Jones about 1933 or 1934, and since then. When they told me and Gene about the government checking them, they told us to start making income tax returns, which I did—the first one I ever made. I had never heard of gamblers paying income tax; I didn't

think we were supposed to. Johnny came out of the war, I think, with a lot of money.

\* \* \* \* \* \*

"Q. Mr. Bostwick, on December 31, 1941, could you tell me how much cash you had invested in the Turf Exchange? A. I couldn't hardly tell you. I imagine we could have had $10,000.00 or $20,000.00. We had a bank roll of $10,000.00 especially to pay off horses. Then the bank roll of the Turf Exchange never run more than $5,000.00 or $6,-000.00, but if it did, it would be cut down. I imagine the total bank roll would run around $15,000.00 all told.

"Q. And one-fourth of that would be yours? A. That is right. When I drew out down there, I drew $5,000.00.

"Q. Did you have any other cash on hand December 31, 1941? A. Yes, sure I had money.

"Q. Could you tell us how much you had on hand at that time? A. No, I can't tell you about 1941, but I know what I had in 1939—that is when I got married. I told my wife what I had. I had around $50,000.-00. I had that in cash money. When I got married, I had an apartment house and one other house, an automobile, and some diamonds, and stock. This is besides my $50,000.00 in cash. I probably had some mortgages because I had some money loaned out. I didn't really put my money to working until I adopted this child about 1944 or 1946. When I got married, I started saving my money; I quit throwing it away."

During the course of this investigation, the agent examined the bank records pertaining to the various accounts of the defendant, his wife, and small adopted daughter, the defendant's stock account with Merrill, Lynch, Fenner & Beane, brokers, the defendant's local tax assessments, all of the Probate Court records in Montgomery and adjoining counties, and formally interviewed and took sworn statements from the defendant, his wife,

his partners and other persons associated with him in the Turf Exchange, and also interviewed the persons to whom, according either to the mortgage records or to defendant's statement, he had made loans.

Starting then with cash on hand December 31, 1939, $50,000.00, the agent made detailed calculations for each year thereafter, adding the income as reported in defendant's return, any loans repaid, proceeds from sale of stock, etc., subtracting estimated cash living expenses and amounts traced to defendant's investments for the year and any other expenditures, and arrived at an amount of cash remaining on hand on December 31, 1945 as $26,920.47.

The agent then computed the defendant's net income for each of the years 1946, 1947, and 1948 on the basis of the bank deposits and currency used for such year. He added the total deposits to all bank accounts and the currency shown to be used, eliminated loans repaid, proceeds from sale of stock and any depletion of currency on hand as of the end of the previous year, subtracted allowable expenditures and non taxable income and calculated the defendant's net taxable income for the year 1946 as $33,963.16 instead of $12,714.08 as reported; for 1947, $51,547.77 instead of $9,876.16 as reported; and for 1948 as $34,031.65 instead of $11,891.52 as reported.

The agent then made a computation of net worth of the defendant and his wife as of December 31, 1945, 1946, 1947 and 1948, and arrived at practically the same amounts that he had reached on the basis of bank deposits and currency used during those years.

The defendant on his part showed some matters not considered by the revenue agent, for example that he had purchased 30 shares of Alabama Power Company preferred stock in 1937 and 1938 and sold them in 1940; that he had sold a diamond to Sol Monsky for $2,400.00 on May 23, 1946; that he had made a loan to Edward F. Taylor of $5,000.00 in June, 1939, which was repaid in the amount of $2,000.00 in 1941, and $3,000.00 in 1942.

The defendant also introduced a statement purporting to show his net worth as of December 31, 1939 as $96,974.00, but upon analysis it was found to contain only the following items, which had not been taken into consideration by the revenue agent:

| | | |
|---|---|---|
| 1. | Reynolds Loan | $ 5,000.00 |
| 2. | Diamonds | 3,000.00 |
| 3. | Taylor Loan | 5,000.00 |
| 4. | Golden Loan | 5,000.00 |
| 5. | Socony Stock | 1,600.00 |
| 6. | Alabama Power Stock | 3,300.00 |
| | Totaling | $22,900.00 |

The revenue agent testified in rebuttal that assuming that the defendant's net worth statement as of December 31, 1939 is correct in every detail, it would reduce the total of defendant's net income for 1946, but would have no effect on the 1947 and 1948 results. The jury found the defendant guilty only under Counts 2 and 3 of the indictment covering 1947 and 1948. We think that the evidence was clearly sufficient for the jury's consideration on the question of the amount of the defendant's net taxable income for each of the years in question.

The question remains as to whether the jury could reasonably find that the defendant "did *wilfully and knowingly* attempt to defeat and evade a large part of the income tax due and owing by him to the United States of America for the calendar year 1947" and for the year 1948, as charged in the indictment. From the manner in which the records were kept, the deposit of money in the name of M. W. Bostwick instead of William C. Bostwick, the keeping of a safe deposit box in the name of Frank B. Cyphers, the failure to keep records of the gambling which the defendant admitted outside the Turf Club, the large amounts of understatement of net income for each of said years, and all of the other circumstances of the case, we conclude that the question of defendant's intent also was for the jury. Spies v. United States, 317 U.S. 492, 499, 63 S.Ct.

364, 87 L.Ed. 418; Holland v. United States, supra, 75 S.Ct. at page 137.

Finding no reversible error in the record, the judgment is

Affirmed.