216 So.2d 731

**William Kyle LIVINGSTON**

v.

**STATE.**

**3 Div. 258.**

Court of Appeals of Alabama.

Nov. 19, 1968.

Elno A. Smith, Montgomery, for appellant.

MacDonald Gallion, Atty. Gen., and Marlin Mooneyham, Asst. Atty. Gen., for the State.

CATES, Judge.

Livingston appeals from a judgment of conviction based on a general verdict of guilt. The indictment was in two counts: one for statutory burglary, second degree; the other for grand larceny.[1]

■ The Legislature has prescribed the same statutory range of maximum and minimum punishment for both these crimes. Code 1940, T. 14, § 86 (burglary, second), and § 331, as amended (grand larceny). Hence, since the court pronounced but one sentence of three years in the penitentiary, no question is presented under Lawson v. State, 33 Ala.App. 333, 33 So.2d 405, and Wildman v. State, 42 Ala.App. 357, 165 So. 2d 396.

Thus, a prima facie case of either or both these crimes would support (apart from other questions) a general verdict.

## I.

Since the State has accepted the statement of facts in the appellant's brief, we shall—by paraphrase—set out the tendencies of the prosecution's evidence therefrom.

The State's first witness was Mrs. Exa Blackwell, manager of Al Levy's, Inc., in Normandale Shopping Centre in Montgomery. About 9:00 A.M., December 13, 1965, as she reported for work, she observed the back door lock had been broken. She called the police department. On entering, Mrs. Blackwell, Mr. Levy and an officer discovered a lug wrench. The door to the fur room had been broken or prized open. Furs were missing of the total value of $3,425.00. Mrs. Blackwell testified that she knew of a night watchman being on duty

and that he made regular rounds during the night.

J. D. Wade, a City Detective for the Montgomery Police Department, testified that he answered a call to the store; that the lock on the back door had been unscrewed with a wrench and the plunger pushed back and the door opened. Going inside he saw a flashlight lying on the floor. Toward the back of the store next to the storage room was a tire tool.

The back of Al Levy's store could be seen from Lynnwood Drive. But someone watching from Lynnwood Drive could not tell when the night watchman would be making his rounds. This because the check point to punch the watchman's portable time clock was out of sight.

A lug wrench described as fitting any Chrysler product was introduced (State's Exhibit 1). It had no tag marking it as the one discovered at Al Levy's store. Mr. Wade was unable to identify it. The State then introduced a second lug wrench (State's Exhibit 2). Mr. Wade identified this second wrench by a tag marking. He could not tell where this Exhibit 2 originally came from. It would fit a Dodge automobile. It had been turned over to the police by a car repairman.

The next witness called by the State was Mr. W. L. Holland, employed by the Alabama Department of "Conversation" (sic). On Sunday night, December 12, 1965, he had occasion to be on Lynnwood Drive, which is on the west side of Norman Bridge Road near Normandale. From about 8:00 o'clock until 11:00 on the night of December 12, 1965, he was in and out of Lynnwood Drive. On these occasions he noticed what he described as a Chrysler product automobile parked facing Normandale. It bore a 1966 tag No. 45–2011. He saw two people in the car but could not tell whether or not it was two men or two

1. Code 1940, T. 15, § 287: "§ 287. Any act or omission declared criminal and punishable in different ways by different provisions of law, shall be punished only under one of such provisions, and a conviction or acquittal under any one shall bar a prosecution for the same act or omission under any other provision."

women, but he did observe them at intervals parked in front of a vacant house. There was a mist or some moisture in the air and hence he was not sure as to exactly whether or not it was two men or a woman and a man in the car.

On cross, Mr. Holland testified in part:

"Q Give us your best judgment how many yards it is across there.

"A Oh, guessing, I'd say 1500.

"Q Fifteen hundred yards from over here up to Al Levy's; is that correct?

"A That's a guess.

"Q Almost a mile?

"A No, not quite a mile."

The tag bearing 1965–66 license number 45–2044 belonged to Mr. W. K. Livingston, Jr., of Hope Hull, for a 1965 Dodge.

Mr. Meredith Harrell testified that he was the manager of the Normandale Shopping Centre. The night of December 12, 1965, he had a night watchman, Mr. Moorer, on duty at that time. His duties were to check the doors and for possible fire approximately every hour, making his rounds to each of the lock boxes or key stations at which time he would use the key to set the time on a clock that he carried with him. Mr. Harrell testified further that Mr. Moorer's rounds were at 9:15, 10:15, 11:15, between 12:00 and 12:15, 1:00 and 1:15, 2:00, between 3:15 and 3:30, 4:15 and the last one between 5:00 and 5:15.

If Mr. Moorer had alertly performed his duties, then the burglary had not taken place prior to 5:15 in the morning of the 13th. Mr. Harrell testified that he did not know the present whereabouts of Mr. Moorer because in February, 1966, he had been discharged for alcoholism. According to the clock for December 12, Moorer had checked the stores as required. Mr. Harrell testified that a person on Lynnwood Drive would have a view of the side entrance of Al Levy's but as to the lock station there is a fence or wall which would obstruct

the view. This would prevent anyone from ascertaining the exact time the night watchman made his rounds to the lock station.

Mr. T. J. Ward, a City Detective, testified that he investigated the case against the appellant, William Kyle Livingston. Detective Ward testified that Mr. Livingston was going across the street from headquarters and he called him back to headquarters and talked to him, at this time knowing that Mr. Livingston was already a suspect in the burglary of Al Levy's store. Mr. Ward testified as to statements made by Mr. William Kyle Livingston concerning his whereabouts and as to the loan of his car and other factors which were later used as statements against him. Prior to this time Mr. Livingston had not been informed of his constitutional rights.

We quote:

"MR. SMITH: We object to this, Your Honor, and we would like to take the witness on voir dire.

"THE COURT: All right.

"BY MR. SMITH:

"Q Mr. Ward, prior to your conversations with Mr. Livingston did you advise him of his rights?

"A No, sir.

"MR. SMITH: Your Honor, we move to exclude the evidence.

"THE COURT: Let's go in the room. We will determine that.

"(IN CHAMBERS)

"(All Parties present as before noted, except the jury)

"MR. RIGGS: Judge, let me say this. There is nothing we seek to get in by this witness in the way of an admission of guilt. I don't believe we have to lay a predicate.

"THE COURT: Well, let's see what it is.

"MR. RIGGS: I just wanted to make that statement so you all would know what our theory is on this.

"THE COURT: All right.

---

"T. J. WARD, resumed.

"BY MR. HILL:

"Q    What did he say to you?

"A    He said that on Sunday evening he picked Jack Keel up at the Holiday Inn on the Mobile Highway.

"Q    Here in Montgomery?

"A    Here in Montgomery. They rode around until approximately 8:30, and then about 9:30 he loaned him his car, and around 10:00 he got the car back and drove Keel out to the airport at Dannelley Field.

"Q    About what time did he drive him out there?

"A    Around 10:00 o'clock that night.

"Q    Did he say he was driving in his car?

"A    In his car.

"Q    Did he mention where he went on Monday, December 13th?

"A    On December 13th, 1965, he said he was in Atlanta, Georgia.

"MR. HILL: I believe that's all.

"THE COURT: I want to ask him.

"BY THE COURT:

"Q    What caused him to tell you that?

"A    Well, I was asking him about a burglary at Al Levy's.

"MR. SMITH: He had to inform him of his rights because he was a suspect.

"THE COURT: Let's find out the whole thing.

"BY THE COURT:

"Q    What was said by you and what was said by him?

"A    Well, I asked him about Jack Keel. Jack Keel was a suspect.

"Q    What led up to that? Where did you meet him?

"A    Where did I meet Sonny Kyle Livingston?

"Q    Yes, when you had this conversation?

"A    He was going across the street from headquarters, and I called him back to headquarters, I said I wanted to talk to him about Jack Keel.

"Q    All right. Go ahead.

"A    The purpose was to talk to him about Jack Keel. But I have just mentioned was—

"Q    Go ahead. You told him you wanted to talk to him about Jack Keel. Then what was said?

"A    He said he had met Jack Keel out at the Holiday Inn that evening, Sunday evening, December 12, 1965. And he said they rode around in his car until about 8:00 o'clock or thereabouts, he loaned Keel the car, he didn't ask Keel what the car was for, but he did loan him the car, and between 9:30 and 10:00 o'clock the car was returned, and he subsequently drove Keel to Dannelley Field apparently for a flight back to Birmingham.

"BY MR. SMITH:

"Q    During this time did you ever tell Mr. Livingston of his Constitutional rights?

"A    No, sir.

"THE COURT: I don't think that has anything to do with it if he was talking to him about Keel, this other man.

"BY MR. SMITH:

"Q    Well, wasn't he also a suspect in this case?

"A Yes, sir.

"BY THE COURT:

"Q Did you tell him he was a suspect?

"A Well, Sonny's car was used in the burglary.

"BY MR. RIGGS:

"Q Well, he told you he had loaned his car to Keel?

"A Yes, sir.

"MR. SMITH: We contend he was a suspect in the case and wasn't informed of his Constitutional rights.

"BY THE COURT:

"Q When you saw him what was your first conversation with him?

"A I said, 'Come on in here, I want to talk to you.' He said, 'What do you want to talk to me about?' I said, 'I want to talk to you about Jack Keel,' to see if he was involved around Keel.

"THE COURT: I will let it go in if that is what he told him.

"MR. SMITH: Your Honor, we feel that he is a suspect.

"THE COURT: Even if he was a suspect, he talked to him about something else, he wasn't talking to him about whether he was in it, or not.

"BY MR. SMITH:

"Q Did you tell him he was in it, about his car and all?

"A Just about his car. I didn't say anything about him though.

"THE COURT: I will let it go in."

"We refer the Court back to the question as to whether or not W. K. Livingston was a suspect in this case, the answer by Detective Ward was, 'Yes, sir.' Therefore, there was a violation of his constitutional rights. Detective Ward testified in open Court as to all the statements concerning Mr. Livingston, his statements about the loan of his car, to whom he had loaned the car, and as to all of the statements by Mr. Livingston concerning his whereabouts after this time. Detective Ward further testified that they had voluntarily kept Mr. Livingston from approximately 1:00 in the afternoon until 10:00 or 11:00 that night and had carried the appellant to Walgreen's Drug Store to ascertain whether or not he could be recognized as the person or persons to whom a flashlight had been sold or if they could locate a flashlight that was similar to the one found at the burglary scene. The clerks testified that they were unable to recall Mr. Livingston being there or not. At this time Mr. Smith [Livingston's lawyer] was allowed to talk with the appellant but was unable to talk with him in private. All the time he was there there was a person employed by the police department present."—Appellant's brief, pp. 8, 9.

Lt. B. H. Johnson, a police officer, testified that he went to the Holiday Inn in downtown Birmingham. He testified that the records indicated that Mr. Livingston had checked in there December 13, 1965, at 6:42 A.M.; that on registering Mr. Livingston gave the tag number of his automobile of 45–2044. Lt. Johnson also testified that Livingston gave written permission for the police to search the trunk of his automobile. Lt. Johnson did not know whether or not there was a lug wrench in the car. Johnson testified that he arrived in Birmingham about 8:00 P. M., December 13, 1965; that Livingston told him that he, Livingston, had been in Atlanta, Georgia, on December 13, 1965. This witness was further asked whether or not fingerprints of Mr. Livingston's had been found at the scene and his reply was, "Not to my knowledge."

After the State rested its case, Livingston's counsel moved to "suppress" the State's evidence on the ground that it did not make out a prima facie case. The Court overruled his motion.

## II.

The basic question presented is whether there was enough evidence of Liv-

ingston's complicity (either as principal or accessory[2]) for the judge to let the jury weigh the evidence under his directions as to the pertinent law. This duty imposes on a trial judge an awesome responsibility, particularly in a criminal cause wherein the scintilla rule does not apply. This court was reversed for using the scintilla rule in what has become the leading case, Ex parte Grimmett, 228 Ala. 1, 152 So. 263.

In that opinion, Brown, J., said, among other things, "There must be substantial evidence tending to prove all the elements of the charge." See also other authorities in Ex parte Grimmett, supra.

The applicable elements of second degree burglary[3] are: (1) breaking and (2) entering (3) with intent (to steal or to commit a felony). Behel v. State, 40 Ala.App. 689, 122 So.2d 537.

Larceny is the (1) felonious taking and (2) carrying away of (3) personalty of (4) another (5) with intent to (a) convert it or (b) deprive the owner thereof. Code 1940, T. 14, § 331, makes grand larceny of stealing from a shop of goods to the value of $5.00 or upwards.

### III.

Our juries are no longer witnesses themselves but only triers of fact. Hence, our books are replete with approved instructions confining the jury to the evidence in the trial.

Charles P. Curtis, in The Trial Judge and the Jury, 5 Vand.Law Rev. 150, says at p. 152:

"The judicial process is a funnel down which a general term becomes particular.

Two things need to be emphasized. One is that a generality does not become particular of itself. There is nothing automatic about it. 'General propositions do not decide concrete cases.' The other is that very often the process is too complicated to be put into words. * * *

\* * * * * *

"My uncle used to say that the jury served the great purpose of ridding the neighborhood of its sons of bitches. Men have been convicted even of murder in a jury's exercise of this function, but the penalty does not often run so high. * *

"My uncle was undoubtedly right in thinking that the jury often, and not always unjustifiably, confuses what a man is with what a man does. * * *

* * * * * *

"* * * But if the law should take the indivdual and not what he did as the unit, there is an end to the rights of individuals. To be sure, the law cannot ignore the fact that it is an individual who is guilty of the crime he is charged with, or liable for the course of conduct which is complained of; but the unit which the law deals with must, so far as possible, be his particular act, not the individual himself. It is what he did, not what he is, that is come to judgment. * * *"

■ The later proof adduced after the State rests must be mentally laid aside because the evidence before the trial court as of the time of the motion to exclude is all that we can consider in reviewing the trial court's overruling that motion. In so

---

2. Code 1940, T. 14, § 14: "The distinction between an accessory before the fact and a principal, between principals in the first and second degree, in cases of felony, is abolished; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid or abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, as in the case of misdemeanors."

3. Code 1940, T. 14, § 86: "* * * any person who either in the nighttime or daytime, with intent to steal or to commit a felony, breaks into and enters * * * any shop, * * * in which any goods, wares, merchandise or other valuable thing is kept for use, sale or deposit, * * * is guilty of burglary in the second degree and shall on conviction be imprisoned in the penitentiary for not less than one year, nor more than ten years."

doing, however, we view it in the light most favorable to the State:

First, someone was in Livingston's car within six hours of the watchman's last round at a distance of 1500 yards from the shop;

Second, furs to a value supportive of grand larceny were missing;

Third, there was proof the furs were taken after burglary;

Fourth, a lug wrench [4] which could have come from Livingston's car was found in the shop; and

Fifth, Livingston, when summoned into police headquarters, did not explain his travels (either with Keel or to Atlanta) to the apparent satisfaction of the investigators; and

Borrowing from Wigmore, Evidence (3d Ed.), § 43, Classification of Circumstantial Evidence, we have used for analysis his format for arrangement of evidentiary facts (Vol. I, pp. 442–43):

*P,* the main factum probandum, is: in count 1, breaking and entering with intent to steal furs, i. e., Act X; (count 2 is the stealing of furs worth $5.00 or more from the shop, i. e., Act X i):

A. *Prospectant Evidence*

1. *Plan*: Livingston's car is seen between 8:00 and 11:00 P.M. Sunday night within 1500 yards of shop door.

2. *Motive*: Furs are in shop, hence animus furandi.

3. *Disposition* to steal: Not here admissible—No evidence.

B. *Concomitant Evidence*

11. Absence of furs well worth over $5.00.

12. Lug wrench for Chrysler product in shop.

13. Distance from Lynnwood Drive to shop 1500 yards.

14. Watchman's required rounds.

C. *Retrospectant (or Subsequent Evidence)*

21. Livingston registers at 6:42 A.M. at Birmingham Holiday Inn 100 miles or more from shop.

22. Livingston tells detective he was in Atlanta December 13.

In Bell v. State, 36 Ala.App. 390, 56 So.2d 683, Carr, P. J., wrote:

"Unquestionably the conviction of the accused depended upon circumstantial evidence. This being true, his conviction should not be allowed to stand unless the evidence adduced at the trial excluded to a moral certainty every reasonable hypothesis but that of his guilt. No matter how strong these circumstances may appear, they do not come up to the full measure of proof which the law demands if they can be reasonably reconciled with the theory that the defendant did not commit the charged crime."

On rehearing in Clayton v. State, 21 Ala. App. 288, 107 So. 724, the majority opinion reads:

"SAMFORD, J. Upon a reconsideration of this record, we find that the only evidence tending to prove the value of the cotton stolen was: 'Cotton was worth about 7½ or 8 cents.' The charge in the indictment was that of grand larceny, in

4. This lug wrench, State's Exhibit 1, which is also a bumper jack handle, was tested by the writer of this opinion on a number of cars on the Judicial Building parking lot. It did not fit two General Motors cars nor a Ford. But it did fit the wheel lugs of a 1960 Chrysler and of a 1966 Plymouth. No proof was offered as to how many cars might have been equipped with such a lug wrench. However, the pertinent editions of the World Almanac give the following passenger car production figures:

|  | 1960 | 1965 | 1966 |
|---|---|---|---|
| Dodge | 362,808 | 547,531 | 532,026 |
| Chrysler | 87,420 | 224,061 | 255,487 |
| Plymouth | 252,453 | 679,539 | 640,450 |

which the value of the cottons alleged to have been stolen was material, in that, before conviction could be had of the higher offense, the value of the property stolen must have been $25 or more.

"Convictions in prosecutions for crime must not be allowed to rest upon speculation or supposition, but in each instance the state must by competent testimony prove every material ingredient of the offense charged.

"In the absence of proof that the cotton stolen was of the value of $25, the majority holds that the rehearing should be granted, the former judgment of affirmance set aside, the judgment reversed, and the cause remanded.

"Reversed and remanded.

"BRICKEN, P. J., concurring."

Judge Bricken, in Gilbert v. State, 30 Ala.App. 214, 3 So.2d 95, wrote:

"The conviction of this appellant, defendant in the lower court, of the offense of grand larceny, upon the evidence disclosed by this record, was wrong and unjust, and to let such conviction stand would, in the opinion of this court, be unconscionable. The meagre and unsatisfactory testimony upon which said conviction was rested is insufficient even to create a scintilla of evidence against the accused, and as has been definitely decided the scintilla rule may not be applied in a criminal case, * * *"

Also therein mere suspicion, surmise or conjecture were rejected as foundation for a criminal conviction; many authorities bolster this principle.

As to the tire tool or lug wrench, we quote from Settle v. State, 26 Ala.App. 287, 158 So. 775:

"Appellant, an unemployed, or intermittently employed, 'steel car builder and structural iron worker,' residing in Birmingham, Ala., some two hundred miles from the scene of the crime, was convicted of or for the offense, and his punishment fixed at imprisonment in the penitentiary for an indeterminate term of from ten to thirteen years.

"The evidence connecting him with the burglary was entirely circumstantial, consisting mainly, but not wholly, of the finding within the bank building, on the morning after the night of the burglary —and apparently used in the furtherance of the burglary—of a certain oxygen tank and a certain acetylene tank, shown to have been recently theretofore in the possession of appellant.

"His said possession was not denied by him; but he undertook to explain * * * [it]."

Somewhat analogous proof was made by the State in Bedsole v. State, 35 Ala.App. 567, 50 So.2d 457, wherein our now Presiding Judge wrote:

"The evidence presented by the State tended to show:

"That a drug store owned by Mr. Johnnie Daniels in Midland City, Alabama, was broken into on or about March 25, 1950, and certain articles of value were taken therefrom, including, among other things, pen and pencil sets, a man's watch and some costume jewelry.

"The evidence further tended to show that on the day after the drug store was burglarized the appellant was in a cafe operated by Francis Knighton, in Phenix City. He (appellant) was handed a $10 bill by one Mills to give to W. O. Franks. This money was shown to have been given to Mills by Knighton in payment of one of the stolen pen and pencil sets, which the said Mills had obtained from Franks earlier.

"It was further shown that appellant was in company with Franks in Phenix City.

"There was evidence by the State that Franks was seen in an automobile near the drug store shortly before the burglary. One witness testified he saw two men in the car. There was no testimony to prove that the defendant, appellant here, was

the man with Franks. In fact, this witness testified on cross examination that he had known defendant practically all of his life; that witness was within ten feet of the automobile and would have recognized defendant had he been one of the men in the car. Witness stated positively that neither of the men was this defendant. On redirect examination in response to a question by the Solicitor: 'You just saw two men out there in the car and didn't see either one of them well enough to identify them?' The witness answered: 'That's right.'

"On Tuesday following the burglary the officers went to the home of Franks and found appellant in bed in the back room. A watch that was stolen from the drug store was found in the house. Mrs. Franks stated to the officers that the watch belonged to her husband and that Franks had been wearing it. None of the property was found in the room occupied by appellant.

\*     \*     \*     \*     \*     \*

"The evidence at best shows only that appellant had been associating with Franks. It creates mere surmise or suspicion which does not warrant a conviction. [Citing cases.]

"In the case of Lang v. State, 252 Ala. 640, 42 So.2d 512, 514 the Supreme Court held: 'Opportunity to commit crime, or even knowledge of its commission, without more, is not sufficient evidence upon which to base a verdict of guilt.'

"The defendant was entitled to the affirmative charge, requested by him in writing, \* \* \*"

See also Colley v. State, 41 Ala.App. 273, 128 So.2d 525 (robbery: insufficient evidence); Wildman v. State, 42 Ala.App. 357, 165 So.2d 396 (burglary: insufficient evidence); Dawson v. State, 43 Ala.App. 254, 188 So.2d 283 (burglary: insufficient evidence).

The nearest to a spotted horse case like unto the one of instant concern is Sumeral v. State, 39 Ala.App. 638, 106 So.2d 270, where we find:

"The most we can infer from the foregoing is: (1) the wire disappeared sometime between Monday morning and 5:00, P.M., Tuesday (we are inferring only *arguendo* that the next to the last quotation above was intended to refer to *Sunday* rather than Tuesday); (2) the defendant had the truck on Monday night; (3) the truck, at sometime before 5:00, P.M., Tuesday, was on the abandoned public roadway some 180 feet from the crib; (4) sometime between Sunday and Tuesday, the wire had been carried or rolled through the weeds; and (5) the defendant 'guessed he could find' the wire.

"The evidence—aside from a possible implication from the last above quoted excerpt which we discuss below—was wholly circumstantial."

"Circumstantial evidence is not inferior evidence:

" 'I remember so well that from time to time men who are not trained in the law have looked with suspicion upon circumstantial evidence and yet so many of the, of our every day acts and our dealings are based upon circumstantial evidence. We just assume that certain things are true because experience has shown that those things are true. We assume when we go to bed at night that the sun is going to rise the next morning because our practical experience has told us that we might expect that. Likewise if we have a heavy snow and we walk down through the woods and we see tracks in the snow, we know from the existence of those tracks that since it snowed a rabbit has passed that way and we would be perfectly willing to accept that demonstration of circumstances just as faithfully as we would the evidence of our own senses or eyes if we had seen the rabbit first run through the snow, and so circumstantial evidence is entitled to the same weight that direct evidence is entitled to *provided*

*that it points one way.'*—from oral charge by Hon. Seybourn H. Lynne in Bostwick v. United States, N.D.Ala. (on appeal at 5 Cir., 218 F.2d 790). (Italics added.)

"However, circumstantial evidence is evidence only if it (along with the other evidence) is susceptible of a reasonable inference pointing unequivocally to the defendant's guilt. The law allows great latitude on admissibility in a case where the prosecution relies mainly on circumstantial evidence, e. g., Willis v. State, 37 Ala.App. 185, 66 So.2d 753. Here we are not concerned with admissibility but sufficiency.

"On appeal where, as here, there was a motion to exclude all the State's evidence and the denial thereof was again put to the trial judge on motion for new trial, we are not considering the degree of proof for the purpose of charging a jury on circumstantial evidence. Rather we must stake out the permissible area of reasonable deliberation by a jury.

"Thus, in Vick v. United States, 5 Cir., 216 F.2d 228, 232, we find the court, per Rives, J., saying:

"'* * * In such cases the test to be applied on motion for judgment of acquittal and on review of the denial of such motion is not simply whether in the opinion of the trial judge or of the appellate court the evidence fails to exclude every reasonable hypothesis, but that of guilt, but rather whether the jury might reasonably so conclude. Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, 232, 233; cf. Yoffe v. United States, 1 Cir., 153 F.2d 570, 572; Remmer v. United States, 9 Cir., 205 F.2d 277, 287. "The weight of circumstantial evidence is a question for the jury to determine; such evidence alone or in connection with other evidence may justify a conviction. Great care, however, must be exercised in drawing inferences from circumstances proved in criminal cases, and mere suspicions will not warrant a conviction." 20 Am.Jur., Evidence, Sec. 1217, p. 1070. As said by Judge Prettyman in Curley v. United States,

supra, "The task of the judge in such case is not easy, for the rule of reason is frequently difficult to apply, but we know of no way to avoid that difficulty." * * *'

"In Bluth v. State, 38 Ala.App. 692, 92 So.2d 685, 690, we stated the major premise, per Harwood, P. J.:

"'* * * An accused charged with a felony should not be convicted on circumstantial evidence unless it shows by a full measure of proof that the defendant is guilty, and must exclude to a moral certainty every other reasonable hypothesis but that of the guilt of the accused, if the facts and circumstances can be reconciled with the theory that some agency other than the accused may have caused the death, then the accused is not shown to be guilty by that full measure of proof which the court requires. * * *'

*       *       *       *       *       *

"No possession of the goods was shown; the testimony to put Sumeral at the scene covered only, at the most, eight hours of a span of some thirty to thirty-five hours.

"'* * * Opportunity to commit crime, or even a knowledge of its commission, without more, is not sufficient evidence upon which to base a verdict of guilt. * * *' Thomas v. State, 19 Ala.App. 499, 98 So. 322.

"See also Lang v. State, 252 Ala. 640, 42 So.2d 512 (4–2 decision), and Bell v. State, 36 Ala.App. 390, 56 So.2d 683.

"Even under the State's evidence, the question of whether or not Sumeral had an opportunity to take and carry away the fencing was left with an open end answer. This failure to close the gap did not come up to the measure of proof laid down in Ellison v. State, 254 Ala. 428, 48 So.2d 176, a case where the defendant undoubtedly had an opportunity but not the sole opportunity to kill the deceased.

Oliver, the owner of the pick-up truck, did not (nor did any other witness) account for its whereabouts during the time the theft could have occurred (Mon-

day morning to 5:00 P.M., Tuesday), save for the time that Sumeral had it. * * *

* * * * * *

"The principle applied here is the same given in Ivey v. State, 40 Ala.App. 75, 108 So.2d 430. Here the facts do not show the agency of the accused, and, accordingly, the judgment below is due to be reversed and the cause remanded."

Since the instant question arises from a lack of proof without any compensatory factor from other proof, manifestly Supreme Court Rule 45 (harmless error) cannot aid the usual presumption in favor of the court below.

We have carefully reviewed the evidence en banc. From that review, under the principles elaborated on above, we conclude it was error to overrule the defendant's motion to exclude the State's evidence on the ground that it did not (as a matter of law) make out a prima facie case of either offense charged in the indictment.

We pretermit detailed consideration of the admission of testimony of Livingston's conversation at the police station. As an abstract matter of law—at least as of the date of this opinion—Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, would appear to apply to exculpatory statements as well as those which directly incriminate.

The special prosecutor argued that the summoning of Livingston to police headquarters to ask him about Keel, made Livingston's presence there distinguishable from Miranda. We consider Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381, has resolved this point. There we find:

"The Government also seeks to narrow the scope of the Miranda holding by making it applicable only to questioning one who is 'in custody' in connection with the very case under investigation. There is no substance to such a distinction, and in effect it goes against the whole purpose of the Miranda decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the Miranda opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody. In speaking of 'custody' the language of the Miranda opinion is clear and unequivocal:

"'To summarize we hold that when an individual is taken into custody, or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is in jeopardy.' 384 U.S., at 479, 86 S.Ct., at 1630.

"And the opinion goes on to say that the person so held must be given the warnings about his right to be silent and his right to have a lawyer.

"Thus, the courts below were wrong in permitting the introduction of petitioner's self-incriminating evidence given without warning of his right to be silent and right to counsel. * * *"

The judgment below is reversed and the cause there remanded for trial de novo.

Reversed and remanded.

JOHNSON, J., concurs in the result.