TYSON, Judge.
Tommy Frank Hare was indicted for the second degree burglary of Medical Plaza Pharmacy, Inc., wherein certain drugs and lawful currency were taken. The jury found the appellant guilty of burglary in the second degree, as charged, and the trial court set sentence at ten years imprisonment in the penitentiary.
Cameron Guy, Detective Sergeant with the Narcotics Division of the Birmingham Police Department, testified that he was on a special assignment, working with the police in the Muscle Shoals area, on June 2-3, 1978. He stated that he was accompanied by his Birmingham partner, Charlie Trucks; Pat Curry, a female police officer; J. K. Eaton, of the Birmingham Police Department; Jim Reed and Jim Williams of the United States Drug Enforcement Administration.
Guy indicated that the officers went to the office of the Muscle Shoals, Alabama, Police Department and there talked with the Chief and other officers about 2:30 on the afternoon of June 2, 1978. As a result of this conversation, the Muscle Shoals officers, working under the supervision of Lieutenant Robert Hall and Birmingham police *MCCXXIV officers, staked out the Avalon Plaza Drugstore, located on Avalon Road in Muscle Shoals, Alabama.
Officer Guy stated that the drugstore in question was placed under surveillance about 3:00 in the afternoon, and shortly thereafter the appellant Tommy Frank Hare and two companions, Barry Wade Alford and Robert Daubach, were observed driving in an automobile near the Avalon Plaza Drugstore. Guy observed the appellant and his two companions turn into the parking lot and drive through it. The appellant and his two companions then drove away, headed toward the Wilson Dam Road. Between 4:30 and 4:45 in the afternoon, Guy observed the three men at the scene of the Avalon Plaza Drugstore, driving a two-tone green 1972 Ford with a vinyl top. Officer Guy and his companion then followed the appellant as he drove over to a K-Mart store, located on Highway 43. Hare and Alford were observed going inside the K-Mart store and then returning with a CB radio, which they installed in the 1972 Ford. This occurred at approximately 5:30 in the afternoon. A few minutes later, the officers were able to pick up the conversation as the appellant and his companions tested the CB. Appellant Hare was observed walking with a “walkie-talkie” in hand and speaking into it. This conversation was picked up on the police radio frequency. The officers stated they remained out of the sight of the appellant and his companions, using binoculars, and heard a voice that was recognized as the appellant’s, using the words, “test, test, test, can you hear me — we’ll use Channel 15.”
The officers then followed the appellant and his two companions as they circled near some apartments parallel to the Avalon Plaza Drugstore and then parked. The officers noticed a Dodge automobile parked next to the Ford in which Hare, Daubach and Alford were riding. Hare and his two companions then drove away in the Ford and did not return again until about 7:45 that evening. At this time Hare was observed driving the Ford into the drugstore parking lot, then driving away a third time.
Hare, Daubach and Alford then returned to the drugstore about 8:35. The officers noted that the drugstore had just been closed for a short time. Daubach was described as wearing a football jersey with No. 32 on the back. Alford was wearing a green pullover sweater, and Hare was wearing a circular striped pullover shirt with jeans.
Alford was observed going inside a convenience store and purchasing some cigarettes and soft drinks. One carload of the officers were no more than fifteen feet from the appellant and his two companions at this time. The three men remained in the parking lot about ten minutes. Alford and Dau-bach then started a blue Dodge automobile, and Hare followed in the 1972 Ford. The two automobiles were kept in vision by the officers as they drove back onto Wilson Dam Road where Alford let Daubach get out of the Dodge in a parking lot near some apartments down the street from the drugstore. Officer Guy then proceeded to follow the Ford car with Hare driving, and saw him pull into a lot near some apartments. He heard the appellant’s voice speaking on the CB radio, stating, “That’s real good brother two, go on about your business, everything is real cool.” During this time the drugstore was under the surveillance of the officers, and it was closed for the evening.
Defendant Hare was observed by Guy riding up and down Avalon Road in front of the drugstore for fifteen to twenty minutes.
Shortly after 9:00 o’clock p. m., defendant Hare picked up his companion, Alford, and pulled into the parking lot of the Seven-Seas fish place. A few minutes thereafter Daubach pulled into the lot, driving the blue Dodge. Officer Guy again recognized the appellant’s, Hare’s, voice as he spoke over the CB radio and said, “Let’s make some calls.” Then the appellant’s voice was heard to say, “Brother one and brother two, in and out, let’s go.” The appellant was *MCCXXV then observed again driving up and down Avalon in front of the drugstore in the 1972 green Ford. A few minutes later, the two automobiles, with Daubach driving the blue Dodge, were observed turning onto Wilson Dam Road toward Highway 157. Appellant Hare was driving the green Ford with Alford riding on the passenger’s side. The officers then followed the two vehicles for about ten miles as they headed southeast from Muscle Shoals on Highway 157 at approximately 10:25 that evening. The two vehicles pulled into an Exxon station, at the intersection of Highways 101 and 157 where Appellant Hare pulled the Ford over to the gas pump and was observed putting in some gasoline. All three men then got into the Dodge and talked for a few minutes, then Hare returned to the green Ford. The two vehicles continued southeast on 157 toward Molton, Alabama. The officers kept the two vehicles under surveillance for approximately another five to ten miles when they decided to stop the vehicles at the intersection of the Molton Highway.
Lieutenant Hall and Agent Williams pulled around the vehicles and in front of the appellant and Daubach at the Molton intersection. Officer Guy and his companion pulled immediately behind them and got out. The officers informed the appellant, Alford and Daubach that they were under arrest. On the back seat of the Dodge was a king-sized pillowcase full of drugs and pills. Officer Guy recognized some of these as being Dilaudid, some barbiturates and some amphetamines.
The appellant, Hare, was driving the 1972 Ford, and a Miranda warning was given to him and his two companions.
Guy stated that he spoke to Hare as he knew him and said, “Tommy, you are in a lot of trouble,” to which Hare replied, “I don’t know about me, but the fellow in front of me there (indicating Daubach) is in a lot of trouble.” This statement was made after a proper Miranda warning.
At the time the drugs were secured and taken back to the Muscle Shoals Police Department, where Lieutenant Hall made an inventory of the items. Guy stated that these bottles contained the label, Medical Plaza Pharmacy, Muscle Shoals. Guy indicated this store was in Colbert County, Alabama.
Lieutenant Robert Hall of the Muscle Shoals Police Department testified that he first talked with Birmingham Officer Guy and other Birmingham officers and federal agents concerning staking out the Medical Plaza Pharmacy in Muscle Shoals about 2:30 on the afternoon of June 2, 1978. Hall indicated that this pharmacy was located in a residential area near some apartments and two doctors’ offices, all of which faced Avalon Road. Lieutenant Hall stated that he drove a police vehicle, unmarked, near the drugstore later that afternoon and observed the appellant and his two companions, Alford and Daubach as they drove around looking at the Medical Plaza Pharmacy. He stated that they were monitoring a CB radio which they saw the men install in the Ford car and followed the appellant’s car, a 1972 Ford, and a blue Dodge, driven by Daubach, until about 8:30 or 9:00 that evening. About this time, Lieutenant Hall was advised that the burglar alarm had gone off at the drugstore and they remained just behind the drugstore in a man’s backyard and there observed Daubach come out of the drugstore, walk across a field, and get into a blue Dodge. Hall then followed Daubach to the point where he met Hare at the Seven-Seas’ parking lot. Daubach arrived first, and a few moments later Hare drove in at the wheel of the 1972 green Ford. At this point the men talked and then started driving east, then southeast away from the Muscle Shoals area. Daubach was leading in the blue Dodge, and Hare was driving the 1972 Ford just behind. He stated the officers kept both vehicles in their vision after they first stopped at an Exxon service station for gas for the Ford, then continued driving toward Molton and Town Creek where it was decided they would arrest the men.
*MCCXXVI Lieutenant Hall stated that he drove past the appellant’s and Daubach’s automobiles, then cut in front of them at the bypass around Molton, Alabama, being the intersection of Highways 157 and 24.
Officer Guy and his companion pulled against the automobile driven by Hare, and all the officers got out and told the appellant and his two companions they were under arrest, then immediately gave them a Miranda card warning. At this time Dau-bach was driving the blue Dodge and Hare was driving the 1972 green Ford with Alford seated on the passenger’s side of the Ford. The men were ordered out of the two vehicles. Lieutenant Hall stated he seized a king-sized pillowcase containing a number of different types of drugs which had the Medical Plaza Pharmacy, Muscle Shoals, label on them.
Lieutenant Hall stated that he took custody of the pillowcase containing the drugs and made an inventory of them upon his return to Police Headquarters at Muscle Shoals. Hall identified State’s Exhibit one, the photograph he made of the drugs in the pillowcase. Among these were the following (R. p. 66);
“There was a bottle of Tincturn Opium. We had one bottle of Codeine, a bottle of Dilaudid, Demerol, Eskatrol, another vial of Demerol, Preludin, Seconal, Nembutal, Sopor, another bottle of Dilaudid, some more Codeine and some more Dilaudid, some more Eskatrol.”
Lieutenant Hall then identified a “walk-ie-talkie” radio and a CB radio and antenna which were taken from the 1972 Ford driven by Hare, the appellant.
On cross-examination, Hall stated the CB radio was of the brand name “MacDonald,” and that he did not find any drugs on the person of Tommy Hare or in the 1972 Ford driven by Hare.
Clyde Ray, Jr., testified that he was the president of an Alabama corporation known as Medical Plaza Pharmacy in Muscle Shoals, Alabama, on June 2-3, 1978. Mr. Ray stated that he was a pharmacist and had locked the business shortly after 8:00 o’clock on the evening of June 2, 1978. He stated he received a call to go back to the pharmacy late that evening and found the front door was broken open, that the burglar alarm had gone off, and a large supply of drugs and narcotics, including sickroom supplies, had been taken. Ray indicated that some money in the form of United States currency was also taken.
Ray indicated that among the missing drugs were some Dilaudid, some Demerol, and a large quantity of barbiturates and amphetamines. Mr. Ray indicated that Lieutenant Hall of the Muscle Shoals Police Department later returned a number of the missing drugs to him.
Lieutenant Hall was then recalled and stated that he returned all except approximately ten bottles taken from Medical Plaza Pharmacy to Mr. Ray.
The appellant did not testify or present any evidence in his behalf.
Prior to trial, the appellant filed a motion to suppress and a motion to quash, both of which were denied.
The trial court gave an extensive oral charge to which no exception was taken.
I
The appellant first asserts that the jury was allowed to separate, thus requiring a reversal of this cause.
The provisions of § 12-16-9, Code of Alabama 1975, permits the trial jury to separate by the consent of the appellant and his attorney, and also the prosecuting attorney, made in open court with the approval of the trial judge.
Record page 11, in pertinent part, is as follows:
“BY THE COURT: I am excusing the remaining jurors until nine in the morning.
“(At this time the remaining jurors left the courtroom)
*MCCXXVII “BY THE COURT: We will move along as fast as we can. The jury will be allowed to separate in this case. The defendant agreed, after a discussion outside the presence of this jury, that you will be allowed to separate in this case. Do you want the rule invoked?
“MR. PURVIS: Yes, sir.
“BY THE COURT: I don’t know who the witnesses are.
“MR. PATTON: Mr. Hall is a witness.
“BY THE COURT: We will take a five minute recess and you can wait right there or walk in the hall, but in this recess and each and everyone — I don’t anticipate anyone trying to say anything to you. If they do, you are under your duty to report it to this Court and I want to protect the right of the jury to separate. Don’t talk about the case to anyone or among yourselves, and allow no one to discuss the case or make any comment— even talking to somebody else where you can hear it. Five minute recess, ladies and gentlemen.
“(After a short recess, court proceedings were resumed)
“BY THE COURT: Court will come to order. Is the State ready?
“MR. PATTON: Yes, sir.
“BY THE COURT: Defendant ready?
“MR. PURVIS: Yes, sir.”
As may be seen, the appellant and his attorney had agreed in open court to the separation by the trial jury in this cause. Moreover, the trial court, as may be seen, properly instructed the jurors concerning this.
Nowhere in this record did the appellant challenge this alleged separation in the trial court by objection, motion for mistrial, or motion for new trial.
The appellant having failed to assert this matter in the trial court, such may not now be asserted for the first time on appeal. Turner v. State, 54 Ala.App. 467, 309 So.2d 503 (1975); Armstead v. State, 57 Ala.App. 459, 329 So.2d 150 (1976); Cooper v. State, Ala.Cr.App., 340 So.2d 871, cert. denied, Ala., 340 So.2d 872 (1976); Woods v. State, Ala.Cr.App., 346 So.2d 9, cert. denied, Ala., 346 So.2d 10 (1977); Luttrell v. State, Ala. Cr.App., 357 So.2d 1018 (1978).
II
The appellant asserts that the State failed to present a prima facie case of burglary in the second degree.
In Eason v. State, 48 Ala.App. 471, 265 So.2d 913 (1972), we find the following:
“The applicable elements of second degree burglary are: (1) breaking, (2) entering, (3) with intent to steal or to commit a felony. The evidence, without contradiction, shows the first two ingredients. Behel v. State, 40 Ala.App. 689,122 So.2d 537. From Behel, this Court per Cates, J., stated:
“ ‘The jury may reasonably infer intent to steal from the mere presence of the accused in the shop in circumstances showing a breaking and entering in the night. 12 C.J.S., Burglary, § 55 . ..”
The record in the case at bar clearly established that the appellant and his two companions entered the Medical Plaza Pharmacy on the night of June 2, 1978, and removed a large quantity of narcotic drugs therefrom. The evidence indicates that the appellant was acting as the lookout by riding up and down Avalon Road while talking with his two companions over the CB radio as they entered the drugstore in question.
Beyond question, the jury could infer the requisite intent to steal under the circumstances established by the evidence in this cause. Eason, supra; Livingston v. State, 44 Ala.App. 559, 216 So.2d 731 (1968); Bates v. State, 52 Ala.App. 257, 291 So.2d 351 (1974); Hare v. State, 52 Ala.App. 279, 291 So.2d 371 (1974); Creel v. State, 53 Ala.App. 504, 301 So.2d 267 (1974), and authorities cited.
It is clear that the State properly presented a prima facie case, and the trial *MCCXXVIII judge therefore properly submitted this cause to the jury for their determination.
We have examined all rulings of the trial court and find this record free of error. The judgment is therefore
AFFIRMED.
All the Judges concur.