92 So.2d 685

**Marcus BLUTH**

v.

**STATE.**

**8 Div. 787.**

Court of Appeals of Alabama.

Feb. 12, 1957.

Griffin, Ford, Caldwell & Ford, Huntsville, for appellant.

John Patterson, Atty. Gen., and J. Noel Baker, Asst. Atty. Gen., for State.

HARWOOD, Presiding Judge.

On December 6, 1954 the blackened and rather badly decomposing body of Mrs. Patrick Meighen was found in the apartment formerly occupied by her and her husband, Captain Patrick Meighen, in Huntsville, Alabama.

Thereafter an intensive investigation was launched by State, County, and Army investigators to determine if Mrs. Meighen's death had been criminally caused.

This appellant, also a Captain in the Army, was soon involved because of his association with the deceased. That his conduct with Captain and Mrs. Meighen was reprehensible cannot be denied. We are not now however dealing with a matter of ethics, but rather with whether the evidence presented by the State was sufficient to establish beyond a reasonable doubt that the appellant was criminally responsible for Mrs. Meighen's death.

The appellant, Captain Marcus Bluth, was legal officer at Redstone Arsenal, near Huntsville. Captain Meighen, accompanied by Mrs. Meighen, arrived in Huntsville for duty at Redstone in November. On 17 November 1954 Bluth met Captain and Mrs. Meighen at the officers mess, and they had drinks together. After that the two men and Mrs. Meighen were together daily for drinks.

On Wednesday, 23 November, 1954, the day preceding Thanksgiving, the Meighens had Bluth to their apartment for drinks, and invited him back for Thanksgiving day.

Captain Bluth arrived about 1:00 P.M. on Thanksgiving day and drinking was resumed. Captain Bluth spent that night, Thursday, in the Meighen apartment. According to Captain Bluth he did so at Mrs. Meighen's request, she stating she did not want to stay in the apartment alone with Captain Meighen. According to Captain Meighen, Bluth was too drunk to leave.

It appears that the Meighen marriage had been shaky for some time, and both had discussed with the the appellant the matter of a divorce.

On Friday morning the two Captains rode into Huntsville to purchase whiskey. Arriving before the liquor store was opened, they went to a cafe for beer, and there further discussed the divorce.

Buying whiskey they returned to the Meighen apartment where they remained until 4 or 5 P.M., when they left to obtain quarters for Captain Meighen at the B. O. Q. at Redstone.

They returned to the apartment again about 7 P.M., where more cocktails were consumed by the two.

They left shortly and returned to the B. O. Q. Around 8:00 P.M. Captain Bluth excused himself, ostensibly to be gone only a few minutes. Captain Meighen did not see him again for several days.

Undoubtedly the appellant contacted Mrs. Meighen upon leaving Captain Meighen on Friday night. That same night Captain Bluth and Mrs. Meighen appeared at the American Legion Club in Huntsville around 9:00 P.M. They had drinks and danced some.

Around 11:00 P.M. Mrs. Meighen's condition was such as to attract the attention of several people in the club. This was after a visit to the ladies room, from which

the deceased emerged appearing "groggy," according to the statement of the appellant.

Miss Mary Hall saw her head bob a few times and then fall forward on her chest.

A short time later Mrs. Meighen laid her head on the table. Captain Bluth was unable to arouse her.

Leonard Johnson, an employee of the club brought a wet towel, and Bluth wiped her face. She did not however revive, and Johnson carried her to Bluth's car. She did not speak, and her eyes were closed, though she looked at Johnson after he placed her in the car.

Johnson thought she had passed out. Another witness, Earl Wilson, testified that Mrs. Meighen "was seriously ill apparently at the time."

Around midnight the appellant was stopped by a military policeman on the arsenal grounds, because of the appellant's manner of driving. At this time a woman was "cuddled" on the front seat, apparently asleep.

Sometime before 2:00 A.M. the appellant registered for a room at a motel. However, the proprietress observed he could not arouse his alleged wife, and looking closer she recognized the woman as Mrs. Meighen. She thereupon returned the room rent to appellant and refused him accommodations. At this time, according to the proprietress, Mrs. Meighen could not be aroused, and did not appear to know where she was.

From this point, according to appellant's statement received in evidence, he drove to Mrs. Meighen's apartment. Not being able to arouse her, he obtained the key to the apartment from Mrs. Meighen's purse, and entered the apartment. Finding whiskey in the apartment the appellant took some drinks and slept therein on a couch.

The next day, which would be Saturday, he spent in the apartment, leaving three times to go out and check on Mrs. Meighen in the automobile. On one of these occasions Mrs. Meighen grasped the steering wheel of the car, but on none of his visits could he arouse her.

He continued drinking and sleeping in the apartment. Around 2:30 A.M. on Sunday morning he awoke and returned to the car.

On this trip he attempted to carry Mrs. Meighen into the apartment by placing her arm over his shoulder, and his arm around her waist. According to the appellant Mrs. Meighen fell to her knees twice during this effort. Reaching the short stairway to the apartment he laid Mrs. Meighen down, then caught her wrists and in this manner he lifted and dragged her into the apartment.

He could feel no pulse on her, and he lifted an eye lid. Her eye looked queer.

By now the appellant testified he had become panicky.

He then emptied some ash trays, smoothed the rug and left the apartment. This would bring us to 28 November 1954.

As before stated, Mrs. Meighen's body was discovered on 6 December 1954, some eight days later.

On 7 December 1954 Mr. C. B. Brooks, an assistant State Toxicologist, arrived in Huntsville to assist in the investigation, and more particularly to examine the body. The report of his examination was not actually completed until the 22 March 1955.

However, on 11 December 1954 an indictment was returned against this appellant containing six counts charging murder in the first degree, one count charging rape, and two counts charging carnal knowledge by administering of a drug or other substance as to prevent effectual resistance.

At the opening of the trial in May three of the murder counts were nol prossed. The remaining three murder counts were nol prossed as to murder in the first degree.

The trial resulted in a verdict of guilty of manslaughter in the second degree, punishment being fixed at a fine of $400, and hard labor for twelve months.

The verdict of the jury had the effect of acquitting the appellant as to those counts of the indictment charging rape, and carnal knowledge, and also of the charges of homicide above the degree of manslaughter in the second degree.

We will therefore confine our review to the evidence in this aspect, particularly in its medical and physiological phase.

Mr. Brooks, as an expert witness for the State, testified on direct examination that the body of Mrs. Meighen was badly decomposed at the time of his examination, all its external portions being completely black.

He made a rather complete dissection of the body, and some portions he took to Birmingham for further examination.

He had a broad judgment that Mrs. Meighen had been dead from 7 to 15 days.

On removal of the scalp he found a bruised area at the back of the head. This bruise was caused from a moderate or slight trauma.

Opening the skull Mr. Brooks found the brain decayed and observed a stained area on the dura, the membrane lining . the brain, about three inches in diameter. This staining was due to extra vascular blood which had decayed and deposited a black stain on the membrane due to decomposition products.

As to the cause of Mrs. Meighen's death Mr. Brooks then testified as follows:

"Q. All right, tell the jury whether or not you were able to and did come to a conclusion as to the cause of death of this person. A. I have a judgment, yes, sir.

"Q. Tell your judgment to the jury. · A. It is my judgment that the death was caused by a blow to the back of the head, probably caused by the head

being in motion and striking a stationary object, rather than the reverse; . and because of that blow· and the sudden stopping, the brain oscillated in its brain cavity in the cranium."

\* \* \* \* \* \*

"Q. And that, in turn, produced hemorrhage or bleeding, which produced pressure on the brain and caused death; is that correct? A. That is my judgment."

Mr. Brooks further testified that the floor of the room where the body was found was of tile composition, covered by a foam rubber mat, one quarter of an inch thick, and on top of this was a carpet at least three eighths of an inch thick.

Such a surface, in his judgment, would be consistent with the bruise on the head, and in his judgment the head would have dropped three or four feet to cause the bruise.

On cross examination Mr. Brooks testified that the hemorrhagic area on the back of the head was not visible externally, but he discovered it on removal of the scalp. The bruise was associated with a very moderate trauma.

When the skull was opened he found the brain to be almost fluid, it readily poured out as a thick sludge.

The decomposition was such that he could not tell what blood vessels had ruptured. .

Mr. Brooks further testified that it is uncommon to find an injury to the vortex of the brain from a fall backward, and this was the first such injury he had observed in his experience as a toxicologist in examining from 75 to 100 bodies of allegedly fatal head traumas. From such a trauma as he found on· deceased at back of head it is common to find a laceration in the forepart of the skull.

It would also be more common to expect a unilateral hemorrhage ·from a blow·on to find a laceration of the brain from a trau-

the back of the head—and it is uncommon ma' of the severity that deceased received, or as he stated, from "that little a blow."

Mr. Brooks also found that the deceased had fragile blood vessels, and was an easy bleeder.

He further testified that the physical effect of the use of alcohol over several hours is to increase the cerebral volume, and to depress the brain.

Nothing in his findings was inconsistent with the deceased being alive when she was carried into the apartment.

Mr. Brooks stated he did not know what fall may have caused the bruise on the back of the head, nor does he know the time it may have been inflicted.

The deceased had bled from the nose and right ear prior to death. Nose bleed is more prevalent in some people than in others, and it is unusual to find bleeding from the ear in the absence of a basal skull fracture. He found no fracture whatsoever in deceased's skull.

In connection with this testimony as to the bleeding from the ear, it should be noted that Mr. Brooks, on recall, testified he had changed his opinion as to the bleeding from ear being prior to death and now thought that the blood had flowed into the ear from the nose bleed.

After the defense had presented its expert medical witnesses, Mr. Brooks was recalled by the State for further examination.

During his redirect examination by the Solicitor, Mr. Brooks at one point was asked to distinguish to the jury the difference between his opinion and his judgment. Mr. Brooks replied:

"I consider that an opinion would be somewhat more conclusive, would have better bases upon which to deduce a certain occurrence; that my judgment is my best understanding of the most logical cause for the condition in question, the best judgment that I can make

under the circumstances that existed. If the circumstances are sufficiently definitive, if I am able to judge pretty definitely, I would refer to it more specifically as an opinion."

As we interpret the above, when Mr. Brooks expressed his judgment, as distinguished from his opinion, he was, so to speak, basing his conclusion upon an educated guess. Speculation and surmise, because of lack of specific data, necessarily played their part in arriving at the conclusion.

In view of Mr. Brooks careful preface that he had a judgment, in stating his conclusion as to the cause of Mrs. Meighen's death, the above distinction is, we think, significant in weighing the probative value of the conclusions reached by Mr. Brooks.

For the defense Drs. John Lary and Robert C. Bibb practicing physicians in Huntsville testified as expert witnesses.

Both witnesses had examined the written report of Mr. Brooks.

Their testimony was to the effect that it is unusual to find a laceration to the brain in the vortex of the skull resulting from a trauma on the back of the head.

It is also unusual for a trauma to cause bleeding on both sides of the brain.

Coma would usually follow a spontaneous hemorrhage from an embedded aneurysm, and would last 24 hours or longer preceding death.

Certain types of spontaneous hemorrhages are more likely to be on both sides of the parietal area, while a hemorrhage from a trauma would usually be on only one side of the brain.

Because of our conclusion that speculation, guesswork, and surmise must be resorted to if the verdict in this case is to be sustained, we have set out the above evidence rather fully.

First, there is no substantial evidence arising to the required degree that this appellant contributed to, or was the cause of

the trauma on the back of deceased's head, which in Mr. Brooks "judgment" ultimately caused her death. It is possible that the appellant may have caused the trauma. On the other hand, the evidence shows that the deceased had been drinking rather steadily for several days.

Under the circumstances, a theory that the deceased struck her head herself is equally tenable. Particularly is this true in view of Mr. Brooks' testimony that he could not tell when or how the trauma may have been inflicted. Other than Mr. Brooks' statement that the trauma observed was consistent with a hypothesis that the head had dropped three or four feet, there is no substantial evidence tending to connect the appellant with the trauma.

Second, we conclude, after a most careful study of the testimony of Mr. Brooks, that the State's evidence as to the cause of death does not rise to the required degree in the absence of speculation and surmise to reinforce it.

In this regard Mr. Brooks' testimony was to the effect that it was uncommon to find a laceration of the brain from "that little a blow;" that it is uncommon to find a laceration in the vortex of the brain from trauma on the back of head, such lacerations usually being on the side of the skull opposite the blow; that it is uncommon to find bleeding in both parietal areas from trauma, the usual thing being that such bleeding is unilateral; that the deceased had fragile blood vessels, and that it was possible that the cerebral hemorrhage of deceased could have been caused by an embedded aneurysm.

When the very factors upon which a conclusion is reached are uncommon and unusual, and contrary to the expected, the conclusion thus reached must be viewed askance. We think Mr. Brooks, in distinguishing between his opinion, and his judgment, did just this.

The possibility that a thing may occur is not alone evidence, even circumstantial, that the thing did occur. Taylor v. State, 30 Ala.App. 316, 5 So.2d 117; Blasengame v. State, 34 Ala.App. 85, 37 So.2d 225. Particularly is this true where, from the same proof, the injury can with equal probability be attributed to some other cause. Orr v. State, 32 Ala.App. 77, 21 So.2d 574; Rungan v. State, 25 Ala.App. 287, 145 So. 171. An accused charged with a felony should not be convicted on circumstantial evidence unless it shows by a full measure of proof that the defendant is guilty, and must exclude to a moral certainty every other reasonable hypothesis but that of the guilt of the accused, if the facts and circumstances can be reconciled with the theory that some agency other than the accused may have caused the death, then the accused is not shown to be guilty by that full measure of proof which the court requires. Lang v. State, 252 Ala. 640, 42 So.2d 512; Ellison v. State, 254 Ala. 428, 48 So.2d 176.

As we stated in the Blasengame case, supra [34 Ala.App. 85, 37 So.2d 228]:

"One of the basic tenets of our Constitution and common law jurisprudence is that only the guilty shall be punished. The liberty of every individual reverts to and depends upon the absolute preservation of this shining principle. Its illumination must not be dimmed by the character of the person upon whom it falls."

Under the developed facts, and the legal principles applicable it is our conclusion that the lower court erred in refusing the appellant's request for the affirmative charge, in denying his motion to exclude the evidence made at the conclusion of the State's case, and in overruling appellant's motion for a new trial.

Numerous other points are argued as constituting error. They are not likely to arise in another trial of this case. We therefore refrain from a discussion of them.

Reversed and remanded.