138 So.2d 272

**Herbert REED**

v.

**STATE.**

**8 Div. 808.**

Court of Appeals of Alabama.

Feb. 13, 1962.

Ralph E. Slate, Decatur, for appellant.

MacDonald Gallion, Atty. Gen., Bernard F. Sykes, Asst. Atty. Gen., and Tommy R. Ogletree, Montgomery, Legal Research Aide, for the State.

CATES, Judge.

Reed was indicted under six counts of murder in the second degree charging him with killing Albert Pickett by various means. The jury found him guilty of voluntary manslaughter under a general verdict and fixed his punishment at ten years in the penitentiary.

In a card game at Reed's home, Pickett had fallen in arrears. He told Reed, "The only way you can get it is to go to my mother to get the money." Thereupon, as though by way of rejoinder, Reed pulled a "stack gun" (apparently an "over and under" .22 caliber derringer), and fired two or three shots in the wall.

Reed went upstairs, having given the gun (which had been reloaded after the second shot) to his wife with the warning, "Don't let nobody go out." Returning downstairs Reed took the gun and he, Pickett, Carrie Carter and Willie Poke went out into the night on the way to Pickett's home to gamble some more. Pickett "was kind of staggering."

Willie Poke, who testified for the State, was walking ahead with Carrie Carter. Hearing a shot, he retraced his route and found Reed standing over Pickett. Reed told Poke, "Come on and help me drag him out of the street. There ain't nothing wrong with him, but he is drunk."

Poke's testimony went on:

"A. We moved him out of the street over to the other side.

"Q. Well, was Cedar Lake [Pickett's nickname] making any noise at that time?

"A. Yes, sir, he was breathing pretty loud.

"Q. Huh?

"A. He was breathing pretty loud, yes, sir.

"Q. Struggling or gurgling?

"A. I don't know what you call it, but it sounded like somebody snoring in their sleep.

\* \* \* \* \* \*

"Q. After you helped move him, what did you do?

"A. He told me, 'You go ahead on'. I said, 'No I'll wait a few minutes', and it wasn't long before I looked back and there was the police there."

Pickett had lain on the ground some ten or fifteen minutes before the officers came and it was another fifteen or twenty minutes before an ambulance was driven up.

There was some testimony that the foot of the cot in the ambulance came unlashed and that Reed's head was "whirled over" as the ambulance driver put it.

Dr. James Bragg, a physician, who examined Reed at the hospital testified, in part:

" \* \* \* he was totally unconscious, was bleeding rather freely from some severe wounds in his mouth; his teeth had been,—I don't know how many,—but several teeth had been out recently, and his tongue was cut deeply and rather far back into his mouth, from which he was bleeding profusely; he had a severe contusion over the back of his head, with a rather good-size hematoma, and he was totally unconscious. The real medical difficulty that we had was trying to establish an airway, that is, get him to breathe easy, which we weren't able to suck the blood out of his windpipe. So in desperation, I did a tracheotomy, opened the windpipe and put a tube in through which we could force oxygen. But even with that he didn't survive but for a relatively short time,—how many minutes, I don't know; in other words, he couldn't breathe. He was making a loud noise, what people call a death rattle,—a loud noise they make.

"Q. It suggested an impairment, a stoppage?

"A. It was an obstruction in his windpipe, yes, sir.

"Q. And that obstruction was, in your best judgment, under the general appearance and diagnosis, that was an obstruction of blood?

"A. Yes, sir.

"Q. Seeping or running down from that condition in his mouth,—is that right?

"A. Yes, sir.

"Q. And Dr. Bragg, you said something about a wound back here on his head,—what did you call it?

"A. A contusion.
"Q. Is that another name,—is that synonymous with a bruise?

"A. Yes, sir.

"Q. A bruise?

"A. Yes, sir.

"Q. I started to say a blow,—a bruise?

"A. Yes, sir.

"Q. Did that, in your best judgment, appear to have been recently administered?

"A. Yes, sir.

\* \* \* \* \* \*

"A. The cause of death was strangulation from aspiration of blood.

When you aspirate any foreign matter, whether blood or water or vomitus, or intestinal content, or what-have-you, that will produce strangulation, or spasm in which they cannot breathe. Ordinarily if we can get enough suction in there and clear the airway, you can restore breathing. But the fact that he was totally unconscious, absolutely limp, didn't even cough when blood went into the windpipe; ordinarily when a man isn't too much out, if foreign material goes into the windpipe it produces coughing, and that is Nature's way of keeping it out; but this man was so out he didn't make an effort to cough, so it added to the difficulty of getting the windpipe clear. So that was the occasion for making a hole in the neck and putting in a tube."

Near the place where Poke had found Reed standing over Pickett, a car was parked at the curb. This car belonged to James Guster who lived on the abutting premises.

Guster, whose door was about fourteen steps from the rear of his car, heard a shot, looked out and saw Reed. He further testified:

"Q. Where was the defendant, Reed, standing?

"A. Standing just like you are standing there now, over behind the car, that is, the tail end of my car, like that is the tail end of the car behind you, and that is the door part right there, and he was standing at the door, betwixt the back wheel and the bumper.

"Q. How much of his body could you see?

"A. From here, on up (indicating).

"Q. From the waist, on up?

"A. Yes, sir.

"Q. Tell what Reed was doing when you looked out there?

"A. He was in the movement of stomping. I don't say he was stomping the man.

"MR. SLATE: We object, and move to exclude that.

"THE COURT: Objection overruled.

"MR. SLATE: We except.

"Q. Stand up there and show the jury how he was doing.

"A. (Witness stands) His shoulder was moving like that (indicating a stomping movement, raising shoulder up and down), with his right shoulder moving with his feet, only he would be turned facing this way (stomping with right foot), but I was standing this way.

"Q. Now, at that time had you seen Albert Pickett?

"A. No, sir, I hadn't seen him at that time.

"Q. The only person you saw was Herbert Reed?

"A. Yes, sir.

"Q. Was there any lights around there at that time?

"A. On the corner.

"Q. How far did you live from the corner?

"A. Next door from the corner.

"Q. What size lot was the corner lot? Do you know?

"A. I imagine that lot ought to be about 40 by 105.

"Q. 40 feet wide across?

"A. Yes, sir, 40 feet front.

\* \* \* \* \* \*

" \* \* \* While I was standing there [at the door, *we add*], I started to turn

and go back, and I heard Herbert say, 'Get up, you're not shot, you can walk', and my wife says, 'James, something is going on out there. Call the law, because we don't have that particular stuff going on in the community'. I said, 'No, you stay out of this'. I seen Herbert when he got down and drug this man. My wife's car was sitting over on the West side, and mine was headed West and her car headed East, and he drug him in front of the car, across in front of the gate, where I could see down there. I turned around and said, 'Call the law, something's done happened.'

"Q. Did he drag the man towards the front of your car?

"A. Yes, sir.

"Q. And you saw him bend over after you heard him say, 'Get up, you aren't shot'?

"A. Yes, sir.

"Q. Did he move the man down,— had he moved on down this way with him?

"A. Yes, sir.

"Q. Which way did he go after he got in front of the car?

"A. He drug the man on down across the gateway, then he called Poke and told Poke to come help him move the man, there wasn't nothing the matter with him but drunk, so Poke appeared up on the East, come behind my car. Then Poke came on and they picked him up from there and carried him 27 steps.

"Q. Did you step that off?

"A. Yes, sir, sure did.

"Q. Did you go out in the yard?

"A. Yes, sir.

"Q. Where Pickett was?

"A. I went out where Pickett was. That's when I knowed who it was.

"Q. Did the police come?

"A. Yes, sir.

"Q. Did you go out before or after the police came?

"A. After the police came.

"Q. Was Pickett breathing then?

"A. Yes, sir, with his tongue hang-out out of his head, and a hole right in there (indicating).

"Q. A hole in the tongue?

"A. Yes, sir, right through there (indicating).

"Q. The tongue was hanging out of his head?

"A. Yes, sir.

"Q. Was he bleeding?

"A. No, sir, he wasn't bleeding too much, only about that tongue.

"Q. Was he laying on his back?

"A. Yes, sir.

"Q. Was his mouth closed or open?

"A. Open.

"Q. Could you hear him breathing?

"A. Yes, sir, breathing (indicating with a gurgling sound).

"Q. Gurgling?

"A. Yes, sir."

There was testimony of bloody footprints at the site. The officers found Reed's derringer with one empty shell in it some four or five steps from Reed who had a cut on the back of his neck.

The defense was that Reed had tried to lift the sodden Pickett who had fallen after staggering. For his pains he was given a cut on the back of his neck. Reed would

explain his companion's death as resulting from cuts and bruises sustained in falling in the street and rolling off or around on the ambulance cot.

We distinguish the evidence here from the paucity of that adduced in Bluth v. State, 38 Ala.App. 692, 92 So.2d 685.

Here there was expert testimony of Pickett's being "drowned" in his own blood and direct testimony of Guster's seeing Reed moving the upper part of his body while standing over a point where Pickett's form is shortly thereafter seen. The motion of Reed's shoulders was enacted for the jury. It was a permissible inference for the jury to ascribe Pickett's cuts and unconsciousness to Reed's activity (or "agency").

Mr. William T. McVay, a toxicologist, who had made a post mortem examination of Pickett's body, testified that Pickett's "tongue was chewed" and he had died of "strangulation on his own blood." Part of his redirect testimony went:

"Q. What about this business up in the mouth, where the laceration of the teeth was? * * * were those wounds up on his mouth, was that consistent with having been stomped or kicked by another human with a hard shoe? Could it have been?

"A. Yes, sir, it would be consistent with that.

"Q. With having been stomped or kicked?

"A. Yes, sir."

Count 3 of the indictment charged Reed with killing Pickett by stomping him. We consider there was evidence, if believed to the required degree, sufficient to support the verdict of guilty of first degree manslaughter included in the indictment under Code 1940, T. 15, § 323.

We have carefully reviewed the entire record as required by Code 1940, T. 15, § 389, and consider the judgment below is due to be

Affirmed.