264 So.2d 208

**J. B. CAUTHEN**

v.

**STATE.**

**4 Div. 142.**

Court of Criminal Appeals of Alabama.

June 13, 1972.

Alton L. Turner, Luverne, for appellant.

William J. Baxley, Atty. Gen., and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State.

CATES, Judge.

Murder, second degree: sentence, twenty years.

I

The deceased, a fifty year old woman named Opal Cauthen, lived in the same house as the defendant who testified that he was not married to her.

About four o'clock in the morning of November 15, 1969, the defendant appeared at a neighbor's house. One of the neighbors, Ivry Jean McGheen, went to Cauthen's house. There lying against the front door steps she found the deceased, then still alive or at least breathing.

"Down across the front" of her clothes the witness saw blood on Opal. Also she descried blood on the ground near a chinaberry tree. Ivry Jean sent Cauthen to call the rescue squad, then she dragged Opal inside and propped her head up with a pillow. A short time later this witness noticed that Opal stopped breathing.

The Sheriff testified in part as follows:

"Q Alright, sir. Sheriff, after you arrived there did you have a conversation with Mr. Cauthen?

"A Yes, sir.

"Q The best you can remember would you relate the substance of that conversation?

"A Yes, sir. I asked Mr. Cauthen then what happened and he said somebody come up there in front of the house between two and three o'clock in the morning and called Opal out to the car.

"Q Would you speak a little bit louder, I am having trouble hearing you.

"A He said a car come up in the yard and Opal got up and went out to the car.

"Q Now, Sheriff, let me ask you. At this time had you advised him of his rights?

"A I did not.

"Q Well, I won't go into that any further then. Did you at any time take a knife from Mr. Cauthen?
"A No, sir, he gave me a knife.

"Q Now, when you say he gave it to you how do you mean that?

"A He said he didn't cut Opal, but he reckoned he would be accused of it and

would have to suffer for it, and I said, 'Well, J. B.' I said, 'Every angle is pointing directly to you' and I asked him then if he had a knife and I said 'I am going to have to place you under arrest, Mr. Cauthen, do you have a knife'? and he said 'Yes, sir.' and he pulled his knife out of his pocket and gave it to me.

"Q He didn't raise his hands and stand against the wall?

"A No, sir.

"Q He handed you the knife?

"A He did that.

"Q Did he make any comment with reference to the knife?

"A He said it was a new knife and he had just bought it.

"Q Sheriff, up until this point when you got the knife had you touched Mrs. Cauthen?

"A No, sir.

"Q Did you examine the knife after he handed it to you?

"A Well, I looked at it, I couldn't examine it."

A toxicologist tested the knife and found stains of human blood of the same type as that found in deceased's body. He was of the opinion that she bled to death and that the bleeding resulted from a stab wound in the heart.

Several witnesses testified there was a heavy frost. The Sheriff in rebuttal testified:

"Q (By Mr. King:) Sheriff, during your investigation of this, I believe you said you did go out there to the church. later that morning?

"A Yes, when I went back over there after good daylight.

"Q And I believe you stated earlier there was a very heavy frost?

"A Yes, sir.

"Q Now, you went over there after Mr. Cauthen had told you about the happenings up at the cemetery or at the church?

"A Yes, sir.

"Q Now, did you specifically look for any signs of any sort of a scuffle, or tire tracks or anything to show that there had been a scuffle there?

"A Yes, sir.

"Q. Did you find anything which would indicate either?

"A No, sir.

"Q Am I correct in assuming that the frost was still on the ground?

"A It was.

"Q Would you leave a foot print when you walked over it?

"A Yes, sir.

"Q And there wasn't any sign of a scuffle or foot prints or tire marks?

"A No, sir."

In McMurtrey v. State, 39 Ala.App. 319, 101 So.2d 88, Harwood, P. J., wrote:

"* * * Further evidence by the State tends to show that this appellant was the only person with deceased during the time said blows could have been inflicted. A homicide being shown, it was incumbent upon the appellant to prove circumstances in mitigation, excuse, or jusification, unless shown by the evidence produced against him. The degree of mitigation, the validity of the excuse or justification are questions for the jury. Champion v. State, 35 Ala.App. 7, 44 So. 2d 616."

See also Wallace v. State, 41 Ala.App. 65, 124 So.2d 110.

II

We consider that, although the defendant denied giving the knife to the Sheriff, it was within the judicial discretion of the trial court as to which account to give credence. In Dannelly v. State, 47 Ala.App. 363, 254 So.2d 434, we wrote, in part:

"The second contention involves the applicability vel non of the exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081. This entails an analysis of the factual setting.

"The State offered in evidence a shotgun which a toxicologist opined had fired at least one spent shell found on the roadside leading from the deceased's home toward Camden, the county seat. The gun undisputedly belonged to the defendant.

"The deceased was shot five times. He was found in bed at his home clad in pajamas. The Sheriff looking for guns asked the defendant if there were any other guns in the house. The defendant said, 'Yes., sir, my gun.' With that he handed the Sheriff the shotgun of instant concern.

"As was said by Judge Harwood in Kelley v. State, 39 Ala.App. 572, 105 So. 2d 687:

"'A search implies a probing into secret places for that which is hidden, People v. Exum, 382 Ill. 204, 47 N.E. 2d 56; it implies force, actual or constructive. Combest v. State, 32 Okl.Cr. 47, 239 P. 936; or a forcible dispossession of the property of the owner by exploratory acts.'

"Certainly here there was no search. The seizure of the gun came about by a voluntary manual delivery of it by the defendant. We find no error."

In brief appellant argues that if he gave the knife to the Sheriff, then he did so only because he was overawed, presumably by the majesty of the law, citing Knox v. State, 42 Ala.App. 578, 172 So.2d 787.

In *Knox*, supra, there was a trespassory entry and a seizure. Here, presumably the Sheriff had been summoned by Cauthen. Moreover, we have been cited to no authority for the contention that a warning must be given to a person before he hands over a thing which might incriminate him. He is not incriminating himself, it is the object which "speaks" for itself. Hubbard v. State, 283 Ala. 183, 215 So.2d 261.

We have carefully considered the whole record under Code 1940, T. 15, § 389, and are at the conclusion that the judgment below is due to be

Affirmed.

All the Judges concur.