288 So.2d 152

Joseph E. WHITEHURST

v.

STATE.

4 Div. 153.

Court of Criminal Appeals of Alabama.

Sept. 25, 1973.

Rehearing Denied Oct. 30, 1973.

Rogers, Howard, Redden & Mills, Birmingham, for appellant.

William J. Baxley, Atty. Gen., and J. Victor Price, Jr., Asst. Atty. Gen., for the State.

CATES, Presiding Judge.

Murder in the second degree (uxoricide): sentence, fifteen years imprisonment.

The essence of the State's case against Whitehurst is encapsulated in a statement related to the jury through the testimony of Marlin Dillard, a detective in the Dothan Police Department. Dillard's testimony on this was:

"February the 5th of '71, he stated that he and his wife had left the office at noontime and went over to this apartment, apartment 51, Carriage House Apartments, to get away from the children for awhile. That a friend of his that was working with him had this apartment rented and that he—Mr. Whitehurst, was using the apartment for a while. [sic] And he further stated that around 5:00 or 5:30, in that neighborhood, that he left the apartment, left her there by herself to go back to his office to exchange automobiles, other than the one that they came over on [sic], to the apartment. And he was gone about 30 or 40 minutes. And before he left the apartment, that there was a fifth of vodka sitting on the dining room table with the exception of a couple of drinks that had been taken out of it, that it was still all in contact; and when he returned, had been taken out of it, that it was still all in contact; and when he returned, the bottle was empty; and that he assumed that she had drank it, or said she was in a drunken condition when he returned; that they got in an argument and a fight and he hit her with his fists. And that's all he would admit hitting her with was just his fists. And that—he didn't say what time this took place, right then or a little bit later, and that he had lain down on the floor beside of her and went to sleep and when he awoken, that he realized that something was wrong with her. She wouldn't respond to him calling her."

A toxicologist testified as to his post mortem examination of Mrs. Whitehurst's body, in part:

"I first opened the thoracic and abdominal cavities with a Y incision, on the anterior portion of the body, and I found evidence of recent bruises in the anterior abdominal wall over the stomach area.

"I found an estimated ½ ounce or 15 cc's or liquid blood in both the left and right lung cavities. The abdominal cavity, or the stomach area, contained large quantities of liquid and clotted blood.

"Inspection of the rib cage revealed ribs # 2 and # 3 on the right front chest were broken. Ribs # 5 through # 9 on the right side were fractured. Rib # 10 was fractured twice on the right rear back. Ribs # 4 through # 9 were fractured on the left front of the chest. Ribs # 8, # 9 and # 10, were fractured on the left side, and rib # 10 was also fractured on the left rear side of the body.

"I examined the lungs and found them to be extremely heavy and subcrepitant. I removed them and found much liquid blood and bloody froth in the tracheobronchial tree, or the air tree. I sectioned the lungs and found them to be extremely congested, and containing an abnormal quantity of blood. The larger bronchi, or the larger portion of the air tree, were completely blocked with blood of recent origin.

"I next examined the heart and the pericardial sac surrounding the heart contained approximately ½ ounce of blood-tinged pericardial fluid. The surface of the heart presented an adequate quantity of adipose or fat tissue. I removed and opened the heart and I found the pulmonary artery contained liquid blood. The ascending aorta and the major valves of the heart presented minimum evidence of calcified deposits or nodules. The coronary arteries were well-patent. I sectioned the myocardium or the muscle tissue of the heart, and found no evidence of recent or old infarction, scar tissue, or no evidence of trauma.

"Examination of the liver revealed deep lacerations, or cuts on the liver surface; tears, you might say; on the posterior or the back portion of the right lobe of the liver. The big lobe. I also found deep lacerations in the longitudinal lobe of the liver. And a small piece of the quadrate lobe of the liver had been completely separated and was located in the pelvic region of the abdominal cavity.

"* * *. I found a moderate quantity of interstitial hemorrhage, or blood within the tissue, around the left kidney.

"I removed and sectioned the left kidney and found it to be moderately hemorrhagic, or moderately bloody, throughout. The right kidney was enclosed in a massive quantity of interstitual hemorrhage or blood, around the kidney. Examination of the right kidney revealed that it had been torn loose from its natural connective tissue and essentially loose in the abdominal cavity. The renal artery and vein, the two main vesseks going to the kidney, were still intact. I removed and sectioned the kidney and found it to be extremely hemorrhagic, or bloody, and badly bruised. The right adrenal gland was ruptured. The left adrenal gland was intact. The pancreas was not remarkable. Examination of the spleen revealed two lacerations on the anterior or upper surface. The first measured ¾ inch in depth and ½ inch in length. The second measured ½ inch in length and approximately ¼ inch in depth.

"The urinary bladder contained an estimated 200 cc's of clear yellow urine. The bladder mucosa was not remarkable.

"Q All right. Now, based on your experience as a Toxicologist, do you have an opinion as to what caused the death of Mrs. Wynell A. Whitehurst?

"A Yes, sir, I do.

"Q What is that opinion?

"A From my findings at the postmortem examination, I concluded that death resulted from aspiration of blood into the lungs, massive trauma, internal hemorrhage and shock associated with the violence inflicted upon the body."

This witness was not asked if the injuries observed were consistent with Mrs. Whitehurst's having been beaten by a man using his fists.

The State at the close of the case elected to go to the jury on Count Three of the indictment which alleged that Whitehurst killed the deceased by beating her with his fists.

I

The judgment entry fails to state expressly that the jury were sworn. It does, however, state the verdict as being given by the jurors "on their oaths * * *."

Therefore, even though *Ratliff*, 20 Ala. App. 454, 103 So. 912, seemingly accorded no significance to "upon their oaths * * *," the absence here of any ground in appellant's motion for new trial distinguishes this record from that in *Fowler*, 261 Ala. 262, 74 So.2d 512.

We expressly hold that "on their oaths * * *" is sufficient to show that the jury were sworn. In *Vaughn*, 236 Ala. 442, 183 So. 428 "sworn according to law" sufficed. See also, Code 1940, T. 30, § 59. We appreciate that a silent record cannot create a presumption which would serve to fill the hiatus of an unsworn jury, i. e., a non-jury. *Slatton*, 49 Ala.App. 377, 272 So.2d 586; *Melton*, 45 Ala. 56.

The transcript of evidence recites that the jury was sworn. Under *Hines*, 238 Ala. 575, 192 So. 423, we cannot supply omissions in the minute entry by reference to the [bill of exceptions] transcript of evidence. But see *Fowler*, supra. We consider that the jury was sworn.

II

The appellant claims that the trial judge erred in overruling his motion for a continuance. The trial, with the return of a

special venire, had been set for August 23, 1971. The grounds for continuance were prejudicial publicity engendered by the police.

The publicity was alleged principally to have come from articles in the Dothan Eagle, a daily newspaper having a circulation of some 11,720 copies in Houston County. Other publicity was claimed from broadcasts over radio and television.

For a more detailed setting we quote from appellant's brief:

"On the late afternoon of August 18, 1971, one Hilton Parrish, who was one of the sureties on Defendant's $25,000.00 appearance bond, was arrested on a charge of attempting to bribe a Dothan detective, Marlin Dillard, by offering him $1,000.00 to change his intended testimony on the murder trial of Defendant. The said Dillard, of course, was probably the most important witness for the State on the trial of the case.

"The original motion for continuance and the amendment thereto, set forth the newspaper articles referred to therein, which have been transmitted to the Court as exhibits and which will not be quoted here at length. The motion as amended also referred to the radio and television publicity given to the matter to that point in time. On the trial date, August 23, the motion was amended by offering two additional exhibits, consisting of 'newspaper articles' appearing on August 20 and August 22. Stipulated facts on the hearing at this time reflected that the arrest of Mr. Parrish occurred in the late afternoon of August 18 and was carried on a 6:00 P.M. news telecast by a Dothan television station, by virtue of the fact that the television camera had been set up in the Dothan Police Station prior to Parrish's being brought in as a prisoner. The clear implication is that the initial publicity was timed and designed with participation of law enforcement officers.

"Exhibit E to the motion, which consists of the article published in the Dothan Eagle for Sunday, August 22, 1971, contains the following statements:

" 'Defense attorneys filed a motion for a continuance after Dothan restaurateur Hilton Parrish, 44, was arrested on a charge of attempting to bribe a Dothan detective to change his testimony in the case.

\*   \*   \*   \*   \*   \*

'White [the District Attorney] also told the court he advised Ramsey [one of defense counsel] Monday there was some "tampering with state's witnesses going on. He said Ramsey told him later that information had been relayed to Whitehurst by Ramsey. "Less than two hours later," White continued, "the man arrested (Parrish) told me what I'd said."

'White said he was not accusing Whitehurst of having anything to do with the alleged bribery attempt, but said there was some "guilty knowledge somewhere" because of "the very fact that my own words came back to me through the man that was arrested." '

"The trial court allowed counsel for defendant to conduct the voir dire examination of the venire. The jurors were questioned in groups. In summary the record reflects the following:

"1. Sixty-seven of sixty-eight jurors resided in homes to which the Dothan Eagle was regularly delivered or in which it was regularly received during the week commencing August 16, 1971.

"2. Sixty-four of sixty-eight jurors had seen articles in that paper on August 20 and August 22, 1971, concerning the bribery arrest of Parrish.

"3. Ten of sixty-eight jurors had seen similar articles in the Montgomery Advertiser.

"4. Twenty of sixty-eight jurors had observed telecasts concerning the bribery arrest on television.

"5. Five of sixty-eight jurors had heard broadcasts of items concerning the bribery arrest on radio.

"6. Forty-four of sixty-eight jurors had heard conversations or discussions by other people concerning the matter.

"7. Seventeen of fifty-seven jurors questioned on this point acknowledged that they had, themselves, participated in such discussions.

"8. Seven of sixty-eight jurors admitted that they felt that the defendant was put in an unfavorable position by virtue of the articles concerning the bribery arrest.

"The motion for continuance was renewed following voir dire examination of prospective jurors. It appeared at this time that all of the jurors had received notice that they were to serve during the week in question prior to the publication of the offending articles, and that the fifteen special veniremen knew that they were called to serve on this case."

(Verbatim copy; bracketed matter added.)

In People v. Sepos, 22 A.D.2d 1007, 254 N.Y.S.2d 759, the Fourth Department remanded for a further hearing on a conviction where newspaper reporters and television cameramen allegedly were present while the accused was interrogated by the State Police. The Court of Appeals in affirming (16 N.Y.2d 662, 261 N.Y.S.2d 293, 209 N.E.2d 285) remarked:

"Although our affirmance of the Appellate Division's order directing a hearing establishes that the petitioner is enttled to postconviction relief if he proves the allegations of his petition, we need not now decide the particular form or nature of such relief. It is enough to say that the petitioner, in order ultimately to prevail, must demonstrate, as he alleges, that televising and broadcasting shortly after his arrest a reenactment of the crime charged against him rendered a fair trial impossible."

In Bearden v. United States, 320 F.2d 99 the Fifth Circuit reviewed the conviction of a sky-jacker. The takeoff for Cuba was aborted when the El Paso police in pursuing automobiles kept the plane from becoming airborne by firing bullets into the tires and engines. The opinion continues:

"The first point raised on this appeal is that the appellant's motion for change of venue should have been granted, in that he was denied a fair trial in the El Paso division of the Western District of Texas. The basis for the motion was that television and radio carried live in the El Paso area the events subsequent to the landing of the aircraft, which events included the attempted take off of the aircraft and arrest of the appellants. Such widespread dissemination of publicity, which included subsequent broadcasts and newspaper coverage, in the El Paso area precluded the possibility of a fair trial there. Most, if not all, of the prospective veniremen had viewed the events which took place at the airport either on television or, as a few of them had, in person.

" * * * The court was cautious to question the jury as to any possible bias or formed opinions with regard to the case from the jurors' viewing of the events on live or taped television or reading about them in the newspapers. Appellant's main thrust in his argument here is that the events came over *live* to the watching audience and that this is quite different from seeing taped news accounts on television at a later date, or reading about them in the newspapers. What difference in live and taped broadcasts there may be to these television viewers is not such as would automatically remove the discretion possessed by the trial judge. All of the jurymen were able to answer the judge's questions with

assurance that they could render a just and impartial verdict, and that they had no preconceived notions as to appellant's guilt or innocence in the case.

\*   \*   \*   \*   \*   \*

" \*   \*   \*   The repeated broadcast of a *confession* given by a defendant prior to his trial on the one hand and the witnessing over television of the *arrest* of a defendant on the other would certainly produce completely different impressions on the part of the viewers. In the first case [Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663] it is hardly conceivable that a defendant would stand a chance of receiving an impartial verdict from a jury made up in whole or part of those who saw the confession. In the latter case this is not necessarily so, and we are persuaded by the language of the Supreme Court in Irvin v. Dowd, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642–1643, 6 L.Ed.2d 751 (1961):

> 'It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'

"Live television coverage is a mere extension of the rapidity with which the news media covers crimes. In this case the events were broadcast not only in the El Paso area but nationwide. In such a situation as this, where there was no evidence of any bias on the part of the jurors including those who witnessed in person some of the events surrounding appellant's arrest, we can not as a matter of law hold that the defendant could not have obtained a fair trial in El Paso. \*   \*   \* "

(Bracketed matter added.)   320 F.2d 99, 101–103

■ In the case at bar we must bear in mind that the publicity concerned the arrest [1] of a person other than the defendant. Furthermore, the exhibits do not warrant any suspicion that Whitehurst instigated or took part in Parrish's alleged witness tampering.

After a consideration of the entire record—both the hearing on the pretrial motions for continuance and that on the motion for new trial—we consider that the trial judge did not abuse his judicial discretion. Particularly, we have noted the careful questioning of jurors. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (quoted above). We distinguish this case from Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663.

### III

As to the claim the court below erred in ruling that Whitehurst's inculpatory statement was voluntary, we quote again from appellant's brief:

> "Propositions of Law 4 and 5 deal with the matter of the inculpatory statement of defendant admitted through the testimony of state witness Marlin Dillard, a Dothan City Detective, over strenuous objection by the defendant and after considerable voir dire examination.

1.   Albeit on an invalid warrant. *Rennow,* 47 Ala.App. 419, 255 So.2d 602.

"The situation in which defendant is purported to have made the statement must be clearly understood. Joe Pilcher, an ambulance company operator, was the first person on the scene on February 6, 1971, and was the first witness for the state. He is not a law enforcement officer. He testified that he inquired of the defendant what had happened, and defense counsel objected to his being allowed to testify to the response made by the defendant on the ground that it was not shown that the defendant was in a position to make a knowing statement at the time. Voir dire examination of the witness was requested and granted. On voir dire examination, the witness characterized the defendant as appearing to him to be 'out in space to a certain extent, and shock' and as being 'dazed and in shock.' At the conclusion of the voir dire, defense counsel renewed the objection and Mr. Pilcher was not allowed to testify to the response made by the defendant, on the sole and only ground that it had not been made to appear that the defendant was in a condition to make a knowledgeable statement.

"Subsequently, M. Dillard testified that he advised defendant of certain constitutional rights in the presence of witness Pilcher and Detective Cherry, as well as Pilcher's son, and received a statement from the defendant in the presence of those individuals. Witness Pilcher was recalled prior to the statement being admitted into evidence and didnot [sic] support Mr. Dillard in the contention of his having been present when any warning was given or any statement made. Detective Cherry was even more positive in the course of his examination that he heard no such warning given by Mr. Dillard and heard no statement made by the defendant to Dillard. Detective Dillard, who arrived on the scene only minutes after Mr. Pilcher, testified that the defendant appeared to him as 'maybe just having woke up or may be had been drinking something the night before.' He further testified that when he 'got through reading his rights to him, he commenced to talking.' In spite of the apparent condition of the defendant, Dillard made no inquiry concerning his desire to have an attorney.

"All of the foregoing matters were presented to the court prior to its admitting Mr. Dillard's testimony concerning the purported statement. Further, defense counsel had assigned grounds of objection relative to the Miranda requirements and the independent requirements of Alabama law concerning the admissibility of confessions and inculpatory statements.

"The incriminating nature of the statement, of course, is that it is the only evidence in the case in which the use of fists appears, and it was on count three of the indictment alone, charging a beating with fists as the means of murder, that the case went to the jury.

"Defendant, of course, testifying in his own behalf, denied any recollection of a warning given to him by Mr. Dillard, and further denied that he had struck his wife with his fists on this occasion."

In *Warren*, 44 Ala.App. 221, 205 So.2d 916, the former Court of Appeals found that the defendant's intoxication at the time of his confessing amounted to mania. The opinion quotes from the Annotation 69 A.L.R.2d 361.

In *Anderson*, 45 Ala.App. 653, 235 So.2d 902, we find:

"Appellant contends that his alleged confession was inadmissible because he was intoxicated at the time it was alleged to have been made, thus rendering anything he might have said involuntary.

"Evidence was heard on the voluntariness of the alleged confession out of the presence of the jury in accordance with

Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. There was ample evidence, even though conflicting, from which the trial judge could conclude that appellant was not intoxicated to the extent of mania. We conclude that the trial judge did not abuse his discretion in admitting the alleged confession for the jury's consideration. Intoxication which would affect the voluntariness of a confession is primarily a question of fact which first addresses itself to the trial judge to determine admissibility and later to be submitted to the jury for whatever consideration it may deem appropriate.

"The rule is well established in this jurisdiction that intoxication short of mania or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words will not render a confession inadmissible. Warren v. State, 44 Ala.App. 221, 205 So.2d 916, cert. denied 281 Ala. 725, 205 So.2d 920; Ray v. State, 39 Ala.App. 257, 97 So.2d 594; Smith v. State, 25 Ala.App. 297, 145 So. 504; Eskridge v. State, 25 Ala. 30."

■ Here, we consider that the evidence of Whitehurst's intoxication, amounting to mania or not, was not so overwhelming as to require the trial judge to exclude the confession as involuntary.

Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694, arguably was not applicable to the instant confession because the defendant, strictly speaking, was not yet in custody. Nevertheless, since the required warning was given we need not pursue a distinction between Alabama and United States Supreme Court cases. See Dotson, 288 Ala. 727, 265 So.2d 162, which rests on United States v. Hayes, 4 Cir., 385 F.2d 375.

### IV

We consider that this case is distinguishable from *Bluth,* 38 Ala.App. 692, 92 So.2d 685. We do this, principally, because in *Bluth* the State failed to exclude the hypothesis of the deceased's being injured by some agency other than that of the defendant.

Whitehurst's statement did not go into a description of the degree of force he employed. Here, when we weigh Whitehurst's confession in the scale, the accused's use of his fists on the body of his wife, and the result thereof are matters for the jury to credit or not.

In *McMurtrey,* 39 Ala.App. 319, 101 So. 2d 88, Harwood, P. J., wrote:

"The evidence of State's witness Sowell tended to show that the deceased came to his death as a result of blows inflicted by a blunt instrument, or a fist. Further evidence by the State tends to show that this appellant was the only person with deceased during the time said blows could have been inflicted. A homicide being shown, it was incumbent upon the appellant to prove circumstances in mitigation, excuse, or justification, unless shown by the evidence produced against him. The degree of mitigation, the validity of the excuse or justification are questions for the jury. Champion v. State, 35 Ala.App. 7, 44 So.2d 616."

See also *Cauthen,* 48 Ala.App. 286, 264 So.2d 208.

Altogether, we consider it was within the province of the jury as to whether or not the State's proof persuaded beyond a reasonable doubt. We consider that the State made out a prima facie case for the jury.

We have examined the entire record and consider that the judgment below is due to be

Affirmed.

All the Judges concur.